2009 Ark. App. 841

**Ronald TADLOCK, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
**Appellee.**

**No. CA 09–638.**

Court of Appeals of Arkansas.

Dec. 9, 2009.

Deborah R. Sailings, Arkansas Public Defender Comm'n, for appellant.

Tabitha B. McNulty, Office of Chief Counsel, Leah Beth Lanford, Little Rock, for appellee.

KAREN R. BAKER, Judge.

Appellant Ronald Tadlock appeals from an order terminating his parental rights in T.T. (born August 12, 2007), and an order adjudicating another child, C.T. (born December 4, 2008), dependent-neglected. We affirm both orders.

On August 12, 2007, Michelle Hrdlicka gave birth to Tadlock's daughter, T.T., in a hospital bathroom. Hrdlicka tested positive for drugs, and the Arkansas Depart-

ment of Human Services (DHS) placed a seventy-two-hour hold on T.T. and another of Hrdlicka's children, six-year-old S.M.[1] DHS obtained emergency custody of the children on August 16, 2007.

On August 22, 2007, Ronald Tadlock tested positive for cocaine. That same day, the circuit court found probable cause for the children's removal from the home and a continuation of DHS custody. The court directed Tadlock and Hrdlicka to follow court orders and the DHS case plan; to cooperate with DHS; to remain clean and sober; to submit to random drug testing; to attend NA/AA meetings and obtain sponsors; to submit to drug assessments and follow recommendations; to attend individual and family counseling and follow recommendations; to view "The Clock Is Ticking" video; and to contact the DHS caseworker and CASA worker weekly. The couple were allowed restricted, supervised visitation upon providing three clean drug screens.

On September 4, 2007, Tadlock again tested positive for cocaine. Thereafter, the court adjudicated T.T. and S.M. dependent-neglected. The court established a goal of reunification; restated its previous orders to the parents; adopted a mediation agreement in which Tadlock and Hrdlicka promised to, among other things, attend NA/AA meetings three times a week and obtain sponsors; and declared that the parents should attend court hearings, maintain stable housing and employment, and maintain a clean, safe, and healthy living environment.

A review order entered on December 12, 2007, continued the goal of reunification despite finding that Tadlock had not complied with the case plan and court orders. A second review order, entered on March 12, 2008, found that Tadlock and Hrdlicka had partially complied with the case plan and court orders. A permanency-planning order entered on July 23, 2008, made similar findings. That order also granted Tadlock and Hrdlicka weekend visitation as long as they remained clean and sober and maintained suitable housing.

On August 29, 2008, approximately one year after the children were removed from the home, the court granted Tadlock and Hrdlicka an eight-day home visit with T.T. and S.M. On October 24, 2008, the court allowed Tadlock and Hrdlicka a sixty-day trial visit after finding that they were in compliance with the case plan and court orders; that they had made significant, measurable progress toward achieving the case-plan goals; and that they had worked diligently toward reunification. The court stated that, if the sixty-day trial visit proved successful, T.T. and S.M. could return home. The trial visit was successful, and the court returned the children to Tadlock and Hrdlicka on December 22, 2008.

Despite the successful trial visit, the children remained with Tadlock and Hrdlicka only a short time. On January 7, 2009, DHS placed a seventy-two-hour hold on T.T. and S.M. and sought emergency custody of them after Hrdlicka tested positive for cocaine during a DHS home visit. Tadlock tested negative for drugs, as he had on all screens since September 4, 2007. DHS also placed a hold on one-month-old C.T., who had been born to Tadlock and Hrdlicka on December 4, 2008. On January 9, 2009, DHS filed a dependency-neglect petition seeking emergency custody of C.T.

---

1. S.M. was not Tadlock's biological child. However, he acted in loco parentis to her and filed a petition to adopt her. This appeal does not concern any parental rights that Tadlock may have with regard to S.M.

Within days, the circuit court placed all three children in DHS custody and found probable cause for their removal from the home. DHS subsequently filed a motion to terminate reunification services and to terminate Tadlock's and Hrdlicka's parental rights to T.T. and S.M. The court scheduled an adjudication/termination/no-reunification hearing for March 2009. Additionally, the court suspended parental visitation and ordered Tadlock and Hrdlicka to attend anger-management classes, based on a counselor's report that the couple's "continuous verbal arguments" during visits caused S.M. and T.T. extreme emotional distress.

The evidence at the hearing demonstrated that Tadlock had obeyed court orders by acquiring stable housing, employment, and transportation; by completing parenting classes; and by remaining drug free for approximately a year and a half. However, caseworker Brandi Cannan testified that Tadlock did not comply with the court's order to attend NA/AA meetings regularly. She also testified that DHS was not certain that Tadlock could take care of the children without the many services that had been in place. According to Cannan, DHS was providing, at the time of the children's removal in January 2009, daycare vouchers, transportation, utility assistance, food vouchers, counseling services, and twice-weekly visits from a social-service aid. Cannan additionally testified that Tadlock should have known that Hrdlicka had relapsed into drug use, and she felt uncertain that Tadlock could ensure that Hrdlicka was no longer in the home and using drugs. According to Cannan, Hrdlicka and Tadlock still had a relationship, and Hrdlicka came to the home to eat, visit, and do laundry. Cannan stated further that Tadlock's job at McDonald's would not generate sufficient income to care for the family. However, she admitted that she had not gone over Tadlock's expenses with him. Cannan further stated that Tadlock had a "violent anger." She said that he "stormed out of the courtroom" at a prior hearing and that, during a DHS staffing, he remarked, "I don't care no more, you can take the baby."

Tamara Stricklin, a DHS social-service aid, testified that Tadlock had a "lackadaisical" attitude about the problems in the home. Stricklin noted inappropriate meal preparation and housekeeping (including a severe roach problem); people going in and out of the house, using the telephone according to Tadlock; and one occasion where she "smelled what I thought was marijuana." Stricklin could not remember if Tadlock was present when she detected the odor. Stricklin also said that she observed a younger couple in the home one morning and that the young man was sitting on the sofa without a shirt on. Stricklin additionally said that Tadlock became very angry with Hrdlicka when he learned that she had tested positive for cocaine and that he yelled at Hrdlicka and made verbal threats; however, according to Stricklin, Tadlock should have known that Hrdlicka was using drugs based on her behavior and demeanor. Stricklin also testified that Tadlock "just doesn't have control of himself emotionally." She said that, during one visit with S.M., Tadlock terrified the child by dragging her into a room and demanding that Hrdlicka tell S.M. "what she [Hrdlicka] had done to cause all of it." Stricklin said that when she tried to discuss the incident with Tadlock, he became "belligerent" and "defiant," telling her that she did not need to tell him what to do. Finally, Stricklin expressed her opinion that the children were not getting enough to eat. She said that she once picked up S.M. from a visitation at 10:15 (presumably in the morning) and the child had not eaten breakfast.

CASA worker Ruth Weatherwax testified that she found Tadlock's home appropriate, that she never smelled marijuana, and that she had no suspicion of drug use (though she had not been to the home since mid-December 2008). She also said that Tadlock cared for the children properly and that they seemed clean and reasonably fed. However, she agreed with DHS's recommendation to terminate parental rights, citing the great number and frequency of services provided to the couple and their failure to take responsibility to move forward. Weatherwax also observed that Tadlock had not attended NA/AA meetings as ordered.

CASA Supervisor Mary Jepson likewise testified that she had seen no proof of Tadlock's attendance at NA/AA meetings. She further said that Tadlock had once become angry and "stormed out" of a staffing-review meeting. She also stated that Tadlock said, "Come on Michelle, let's go do drugs, they're going to take our kids." However, Jepson said that Tadlock apologized minutes later. Jepson also testified that Tadlock had "done a good job"; that there was a lot of sympathy for him; that he had arranged to have someone look after the children; and that no one had a factual basis to conclude that he knew of Hrdlicka's drug use. However, Jepson testified that both Tadlock and Hrdlicka were "emotionally unstable" and "very dependent on each other." She stated that Tadlock indicated that he would keep Hrdlicka out of the home but that Hrdlicka had been in the home regularly during January and February 2009. According to Jepson, she had no separate address for Hrdlicka that could be verified.

Foster mother Barbara Richie testified that she was worried about T.T.'s new eating habits after the child came back into her care in January 2009. Richie said that T.T. would grab her plate and her drink and hold them closely, would cry for more food, and would eat more than she normally did. Richie was concerned that T.T. had not been getting enough food. Richie also noted that on some occasions when she picked up S.M. at 5:00 p.m. after a visitation, the child was hungry and would tell her that she had only eaten breakfast that day. Richie stated further that Tadlock should have known that Hrdlicka was using drugs, given that she herself could tell that something was wrong and that Hrdlicka's behavior was different.

Kristen McGrew, a therapist for S.M., testified that she had no evidence that Tadlock had done anything inappropriate since T.T. had returned home in December 2008. However, McGrew recommended that visitation be stopped in February 2009 due to Tadlock and Hrdlicka's arguing in front of the children. McGrew described the arguing as "detrimental." Family Service Worker Kerri Worley testified that, while Hrdlicka had an extensive history with DHS and that four other children of hers were no longer in her care, Tadlock had no prior history with DHS. Adoption specialist Emily Burns testified that T.T. was adoptable.

Ronald Tadlock testified that he did not suspect Hrdlicka of relapsing into drug use in January 2009. He acknowledged that, at the January 13, 2009 probable-cause hearing, he indicated that Hrdlicka was no longer living with him. However, he admitted that Hrdlicka had since been to his house to eat or do laundry. He also admitted that Hrdlicka had signed for a package at his home on January 28, 2009, and that Hrdlicka had been staying with him since March 2, 2009 (approximately two weeks before the hearing) because he had injured his ribs. Tadlock also testified that he had not allowed questionable people into his home. He explained that the

young couple that Tamara Stricklin observed there one morning were on the premises to take a shower because their water had been disconnected. Tadlock also explained that the smell of marijuana detected by Stricklin could have been coming from his neighbor's clothes. However, he said that the neighbor was not allowed in the house any longer. The court observed on the record that Tadlock was sobbing during most of his testimony.

Following the hearing, the circuit court entered an order that terminated Tadlock's (and Hrdlicka's) parental rights in T.T. and S.M. The court found that DHS had an appropriate permanency plan for T.T.; that T.T. was likely to be adopted; that there was potential harm in returning T.T. to Tadlock; and that the following grounds for termination had been proved: (1) T.T. had been adjudicated dependent-neglected and continued out of the home for twelve months and that, despite DHS's meaningful efforts, the conditions that caused removal had not been remedied; (2) T.T. had been subject to neglect or abuse that could endanger her life, specifically, the mother's drug use; (3) other factors or issues arose after the original petition had been filed and that the parents manifested an incapacity or indifference to remedy those factors or issues; (4) the parents had subjected T.T. to aggravated circumstances. The court also entered an order that adjudicated C.T. dependent-neglected. The court found that the mother had relapsed into drug use and that Tadlock "knew or reasonably should have known that the mother was using illegal substances and failed to protect" C.T. Tadlock appeals from both orders, arguing that the evidence was insufficient to warrant termination of his parental rights to T.T. or to adjudicate C.T. dependent-neglected.

## I. Termination Decision

Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents. *Meriweather v. Ark. Dep't of Health and Human Servs.*, 98 Ark. App. 328, 255 S.W.3d 505 (2007). DHS must prove by clear and convincing evidence that termination is in the child's best interest and that at least one statutory ground for termination exists. Ark.Code Ann. § 9–27–341(b)(3)(A) & (B) (Supp.2009). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Meriweather*, 98 Ark. App. 328, 255 S.W.3d 505. When the burden of proving a disputed fact is by clear and convincing evidence, the appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* We review termination-of-parental-rights cases de novo. *Id.*

The gist of Tadlock's argument on appeal is that, while Ms. Hrdlicka was proven to be an unfit parent, he was not. He cites, among other things, his stable, long-term employment; his testing negative on all drug screens after September 2007; and his compliance with the case plan and court orders. According to Tadlock, these accomplishments, along with his lack of fault in Ms. Hrdlicka's drug relapse, demonstrate that the circuit court clearly erred in finding potential harm in returning T.T. to him and in finding grounds for termination. We disagree.

In conducting its best-interest analysis, the court must consider the potential harm in returning the child to the

parent. Ark.Code Arm. § 9–27–341(b)(3)(A)(ii).[2] This potential-harm inquiry is but one of the many factors that a court may consider, and the focus is on the *potential* harm to the health and safety of a child that might result from continued contact with the parent. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Id.* Furthermore, the potential-harm analysis should be conducted in broad terms. *Id.*

Given this authority, we cannot say that the circuit court clearly erred in finding that termination was in T.T.'s best interest, based on the potential harm in returning her to Tadlock. Foremost, we note Tadlock's inability to sever ties with Hrdlicka, a person with a long-term, unresolved drug problem so severe that she tested positive for drugs after giving birth to T.T. and tested positive only a few days after regaining custody of her young children, despite receiving drug treatment. Our courts have affirmed termination cases in which a parent continued to have contact with someone who had harmed the children through abuse or neglect. *See generally Trout v. Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d 486 (2004); *Sparkman v. Ark. Dep't of Human Servs.*, 96 Ark. App. 363, 242 S.W.3d 282 (2006); *Wright v. Ark. Dep't of Human Servs.*, 83 Ark. App. 1, 115 S.W.3d 332 (2003). Additionally, DHS presented evidence of Tadlock's inability to control his anger, his impulses, and his emotions. Witnesses testified that Tadlock had a violent anger; that he was out of control; that he made rash comments about relinquishing custody of the children or resuming drug use;

that he had stormed out of the courtroom and DHS staffings; that he had dragged S.M. into a room during visitation and ordered Hrdlicka to explain to the child Hrdlicka's fault in the family's situation; that visitation ceased because of this incident; and that he became belligerent with a DHS worker. The presence of anger-management issues has been cited as a factor in upholding a termination decision. *Belue v. Ark. Dep't of Human Servs.*, 104 Ark. App. 139, 289 S.W.3d 500 (2008).

Further, Tadlock did not regularly attend NA/AA meetings as ordered by the court and as he had agreed to in mediation. Though he had been drug-free for a year and a half, the fact remains that he disregarded this aspect of his recovery. Moreover, witnesses expressed concern that the children in the household were not properly fed. Tamara Stricklin testified about an occasion where S.M. had not eaten breakfast by 10:15 a.m., and foster mother Barbara Richie testified to picking up S.M. from visitation at 5:00 p.m. and the child having had only one meal. Further, T.T.'s medical evaluation stated that she may have been deprived of adequate food and noted that she had been observed saving food to eat later.

The above factors demonstrate the potential for dangerous and unhealthy circumstances in returning T.T. to Tadlock, such as exposure to emotional instability and anger, poor nutrition, and the continued exposure to the drug addiction of the mother who he admitted was unfit as a parent. They also support a finding of grounds for termination, namely that other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that returning the child to parental custody is contrary to

---

2. The court must also consider the likelihood that the child will be adopted. Ark.Code Ann. § 9–27–341(b)(3)(A)(i). Tadlock does not contest the circuit court's consideration of that factor.

her health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to parental custody. Ark. Code Ann. § 9–27–341(b)(3)(B)(vii)(*a*). We therefore affirm the termination order.

## II. *Dependency–Neglect Adjudication*

Tadlock argues next that the circuit court erred in adjudicating C.T. dependent-neglected. The juvenile code requires proof by a preponderance of the evidence in dependency-neglect proceedings. Ark.Code Ann. § 9–27–325(h)(2)(B) (Supp.2009); *Brewer v. Ark. Dep't of Human Servs.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001). We review the circuit court's findings of fact de novo, and will not set them aside unless they are clearly erroneous. *Brewer, supra.*

A dependent-neglected juvenile is any juvenile who is at substantial risk of serious harm as a result of certain acts or omissions, including neglect or parental unfitness, to the juvenile, a sibling, or another juvenile. Ark.Code Ann. § 9–27–303(18)(A). "Neglect" includes a "failure or the irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile." Ark.Code Ann. § 9–27–303(36)(A)(iv). Tadlock concedes that Ms. Hrdlicka's relapse into drug use may have constituted such neglect. However, he argues that there was no evidence that *he* neglected C.T.

We find no clear error. The juvenile code is not concerned, at the adjudication stage, with which parent committed the acts constituting dependency-neglect. *Howell v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 612, 2009 WL 3028987; *Albright v. Ark. Dep't of Human Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007). The finding of dependency-neglect is not directed at the parents; the question is whether the *juvenile* is dependent-neglected. *See Albright, supra.* Because of Ms. Hrdlicka's relapse into drug use, C.T. was unquestionably dependent-neglected. The court therefore did not clearly err in its adjudication order.

Tadlock also contends that the circuit judge did not realize during the termination hearing that she was also conducting an adjudication hearing with regard to C.T. However, the hearing had just concluded when the judge recalled that dependency-neglect was also an issue, and she was in a position to make the adjudication decision based on the evidence she had just heard. Tadlock therefore cannot show that he was harmed by any confusion regarding the subject of the hearing.

Affirmed.

PITTMAN and KINARD, JJ., agree.