2011 Ark. App. 574

**David CARIKER and Laura Cariker, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

No. CA 11-529.

Court of Appeals of Arkansas.

Sept. 28, 2011.

ing expert, the law judge gave little weight to his opinion.

Leah Beth Lanford, Little Rock, Janet Renee' Lawrence, Conway, for the appellants.

Tabitha Baertels McNulty, Little Rock, Melissa Bristow Richardson, Jonesboro, for the appellee.

CLIFF HOOFMAN, Judge.

Appellants David and Laura Cariker have filed separate briefs on appeal from an order terminating their parental rights to their child, B.C. Laura argues that DHS failed to provide reasonable services to achieve the goal of reunification and that she made measurable progress toward remedying the conditions that caused removal. David's attorney has filed a no-merit brief. We affirm the termination of both parents' parental rights.

On November 20, 2008, DHS took emergency custody of B.C., then age six, due to failure to protect, inadequate supervision, and mental injury. DHS had received numerous phone calls concerning B.C.'s safety, and the Pope County Sheriff's Department had responded to his home numerous times for domestic disputes, during which David was intoxicated. B.C. had witnessed verbal and physical altercations between his parents and had attempted to stop his father from abusing his mother. B.C.'s therapist noted that B.C. had behavioral problems due to the anxiety he felt for his mother's safety when he was away from her. The child's therapist and DHS were concerned for the child's safety due to the ongoing abuse.

B.C. was subsequently adjudicated dependent-neglected, and in a review order entered May 11, 2009, the court found that DHS had made reasonable efforts to provide services to achieve the goal of permanency, specifically, drug and alcohol assessments, psychological assessments, referrals for parenting classes, referrals for counseling, case management, home visits, a foster-family home, supervised visitation, home-study services, comprehensive medical assessments, and medical services. David was ordered to complete an inpatient residential-treatment program, and Laura was ordered to have unsupervised weekend visitation while David was at inpatient treatment.

In later review orders, the court continued to find that DHS had made reasonable efforts to provide services, increased visitation for Laura, and ordered Laura to obtain gainful employment. In a permanency-planning order entered November 16, 2009, the court approved Thanksgiving and Christmas visitation and gave DHS the discretion to do a trial placement with the parents after Christmas vacation. The court directed that DHS provide $600 cash assistance for repair of the Carikers' car and provide transportation assistance until the repair was completed. In the next permanency-planning order, the court found that B.C.'s return to the custody of his mother was no longer contrary to his welfare. B.C. was returned to Laura's custody, and the court ordered visitation between B.C. and David to be supervised by Helen Boyce, Laura's sister.

On May 11, 2010, DHS filed a motion for ex parte emergency change of custody requesting that B.C. be immediately placed back in the custody of DHS. DHS had received information that B.C. was at his mother's home with David, who was drunk, and that there were dog feces in the home. Caseworker Angel Deal went

to the home, and David told her that he had picked up B.C. from Helen's house two hours earlier because Helen could not keep him anymore. B.C. had been staying with Helen while Laura was in the hospital. Deal observed empty beer cans and that David's eyes were red and glassy. She also observed numerous piles of dog feces in the living room and kitchen floor. B.C. stated that he went with his father to the hospital to visit his mother. He told Deal that his mother told him the family planned to move to Colorado when the court case was closed so they could be a family again and no one will tell on them or take him away again. When asked if his mother and father were back together, B.C. said they were but that they did not fight anymore.

In a review order entered September 15, 2010, the court ruled that DHS had made reasonable efforts and that the goal of the case should be termination of parental rights. On October 11, 2010, DHS filed a petition for termination of parental rights. The petition stated that the grounds for termination were Arkansas Code Annotated section 9–27–341(b)(3)(B)(i)($a$), that the juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parents for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parents and correct the conditions that caused removal, those conditions have not been remedied by the parents; and section 9–27–341(b)(3)(B)(vii)($a$), that other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parents is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parents' circumstances that prevent return of the juvenile to the custody of the parents.

A termination hearing was held on February 11, 2011. Laura Cariker testified that her current relationship with David was that she saw him now and then, even though she had been ordered to have no contact with him. She testified that he came to her house to take baths and wash his clothes because he had no water. She testified that she went grocery shopping with David and took him to buy beer, even though she acknowledged his alcohol problem. The parties were divorced on June 25, 2010. Laura testified that if B.C. were returned to her home, she would not allow contact between B.C. and David. She said she currently has contact with David because B.C. is not with her but that for a period of about four months when B.C. was in her home, from January to April 2010, she had no contact with David.

Laura testified that in April of 2010 she began having problems with her gall bladder and was hospitalized for two and a half to three weeks. After being released, she said it took her five or six weeks to get back on her feet. She testified that she worked at a retirement center in Morrilton from October 2010 until January 2011, when the center was shut down. She said she used money from this job to repair the floors in her home, with the exception of one room. Laura testified that a few weeks prior to the termination hearing she asked for DHS to provide transportation to certified nursing assistant (CNA) classes in Russellville, in order to get certified for a nursing home job in Atkins. Deal told her that it would not do any good to go to CNA classes because she could not get licensed because she was on the child-neglect registry. Laura testified that she told Deal her name had been taken off the registry following an appeal. Laura testi-

fied that at one point she had asked for more counseling, but Deal said there was no need for more.

Angel Deal was the caseworker on this case since October or November 2010. Deal testified that she had a discussion with Laura about housing at every home visit, which was at least once a month. Deal told Laura to apply for housing, and Laura would respond that David told her she would not qualify. Deal stated that DHS never promised to pay to have the floors repaired, that this was never ordered by the court, and that DHS made housing referrals instead. Deal testified that Laura's counselor had released her because she was not making progress due to her continued contact with David. Deal testified that DHS had also provided budgeting and homemaking services and had made referrals for employment. She stated that she told Laura that DHS did not have the resources to take someone back and forth to work everyday.

Deal testified that David had completed inpatient treatment for his alcohol addiction, but he continued to drink. She had referred David for outpatient substance-abuse treatment and counseling, but he did not attend. David was suspected of drinking while in a car accident on January 15, 2011, but he was not arrested. Deal testified that David was at Laura's home every time she visited, with the exception of a visit two weeks prior to the hearing. Deal testified that this case was in pretty much the same state at the hearing as when it started because there were still substance abuse issues, the parents still had contact with each other, and Laura had no transportation. Deal stated that she did not see the situation changing because Laura and David were completely dependent on one another, although Deal had tried to talk with Laura about the importance of obtaining a support system

outside of David. Deal felt like returning B.C. to his parents would put him in the same situation he had been removed from.

Deal testified that DHS had a family that had gone through classes to become an approved adoptive home in case B.C. was free for adoption. She said that this family was aware of his needs and had dealt with him. Deal believes that there is a very high likelihood that he would be adopted.

Jay Gentry, B.C.'s counselor, testified that B.C. was referred to him when he was in kindergarten in 2008, and Gentry was his counselor for about six months from the fall of 2008 until early 2009. B.C. wanted to go home to be with his mom instead of being at school because he was afraid his dad was going to hurt his mom. Gentry testified that on several occasions, B.C.'s father had physically abused his mother in front of B.C. Gentry testified that B.C. was having behavioral disruptions or emotional outbursts in class almost daily. Gentry testified that before B.C. was in DHS custody, his parents separated for a time and he improved. Gentry stated that if B.C.'s mother continued to have contact with her abuser, he would not recommend that B.C. be placed back in the home. When he was removed from the home, Gentry stated that B.C. was less erratic with his emotions.

Helen Boyce testified that on May 8, 2010, David came to her home and took B.C. with him. She stated that B.C. wanted to go with him and that Laura, who was in the hospital, had nothing to do with it.

The trial court terminated both parents' parental rights, noting David's unresolved alcohol and domestic-violence issues and Laura's continued contact with him. The court also noted that Laura did not have suitable housing, employment, transportation, or any family support other than David.

■ Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents. *Fredrick v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 104, 377 S.W.3d 306. DHS must prove by clear and convincing evidence that termination is in the child's best interest and that at least one statutory ground for termination exists. *Id.;* Ark.Code Ann. § 9–27–341(b)(3)(A) & (B) (Supp. 2011). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Fredrick*, 2010 Ark. App. 104, 377 S.W.3d 306. When the burden of proving a disputed fact is by clear and convincing evidence, the appellate inquiry is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* We review termination-of-parental-rights cases de novo. *Id.*

Laura argues that she made measurable progress toward remedying the conditions that caused removal, but DHS failed to provide meaningful services and reasonable efforts toward ⌊8reunification. Laura argues that, when B.C. was placed back in the home and David began to abuse alcohol again, she kicked David out of the home and notified DHS. She claims that she maintained no contact with David for over four months and strictly followed the court orders for no contact to occur between B.C. and David. Laura argues that leaving B.C. with her sister when she was hospitalized seemed to be a wise choice because even the court believed Helen was a responsible and appropriate caregiver, as evidenced by the fact that the court appointed her to supervise visits between B.C. and David. Laura argues that Helen turned B.C. over to David's care without her knowledge and that after this incident and her release from the hospital, she divorced David.

Laura also argues that she has complied with all of the requirements of the case plan. She contends she has a stable home in spite of the fact that DHS never provided her meaningful assistance with housing as was ordered by the court. Laura argues that she sacrificed her limited income to repair the floors in her home and that DHS should have offered cash assistance for this. Laura claims that her obvious efforts to obtain employment were squelched by DHS. She notes that her job at the retirement center ended when the center was shut down, and she argues that Deal tried to discourage her from seeking the CNA training and nursing-home employment. She argues that she could not provide her own transportation to CNA classes because her car had broken down and she lacked the funds to repair it. Laura argues that if she needed more counseling to satisfy the court's order, it was DHS's obligation to provide it.

■ Laura acknowledges that she was not a perfect parent and did not avoid all contact ⌊9with David; however, she argues that she made measurable progress toward remedying the situation and obtaining reunification. Laura argues that she can take B.C. home immediately and that she has proved that she will not allow David to have contact with B.C.

■ DHS and the attorney ad litem argue that Laura's meaningful-efforts argument is procedurally barred. The failure to appeal from any of the previous orders in which a trial court has determined that DHS made meaningful efforts toward reunification precludes this court from reviewing any adverse rulings from those orders

not appealed. *Jones–Lee v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 160, 316 S.W.3d 261. As DHS notes, the circuit court found that reasonable efforts were made throughout this case in final, appealable adjudication and review orders. As none of these findings were appealed, Laura has waived this argument.

DHS argues that Laura's argument also fails on the merits. DHS contends that they provided Laura with transportation, gas, home visits, housing suggestions, counseling, budgeting, and homemaker services. Even though Laura completed some parts of the case plan, DHS argues that partial compliance with a case plan does not justify reversing a termination case if the parent continued to make decisions adverse to the child, including remaining in a relationship with an abusive husband. DHS argues that any possible deficiencies with regard to the services to address Laura's housing and transportation issues still would not resolve the issues relating to her relationship with David, the major hurdle to reunification. DHS argues that Laura remained in a committed relationship with David, who failed to remedy his alcohol addiction, and that this relationship would have continually placed B.C. in jeopardy of returning to foster care.

■ ⌐₁₀In conducting the best-interest analysis, the court must consider the potential harm in returning the child to the parent. Ark.Code Ann. § 9–27–341(b)(3)(A)(ii). This potential-harm inquiry is but one of the many factors that a court may consider, and the focus is on the *potential* harm to the health and safety of a child that might result from continued contact with the parent. *Tadlock v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 841, 372 S.W.3d 403. The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Id.* Furthermore, the potential-harm analysis should be conducted in broad terms. *Id.*

■ We cannot say that the trial court clearly erred in finding that termination was in B.C.'s best interest, based on the potential harm in returning him to Laura. This court has affirmed termination in cases where a parent continued to have contact with someone who had harmed the children through abuse or neglect. *Tadlock*, 2009 Ark. App. 841, 372 S.W.3d 403. In *Tadlock*, we noted the father's inability to sever ties with the mother, a person with a long-term, unresolved drug problem so severe that she tested positive for drugs after giving birth to the child and tested positive only a few days after regaining custody, despite receiving treatment. *Id.* Here, David has received treatment for his alcoholism, but he has continued to drink even when B.C. was in his care. It was David's alcoholism that contributed to the domestic abuse between the parents in B.C.'s presence. When B.C. was in the home witnessing the abuse, he had behavioral disruptions or emotional outbursts almost daily. Although the parties have divorced, Laura has been unable to sever ties with David. Furthermore, since the case began, Laura has only been employed for approximately four out ⌐₁₁of twenty-seven months. Her inability to maintain stable employment and transportation only seem to compound her reliance on David.

These facts establish the potential for unhealthy circumstances in returning B.C. to his mother. They also support the finding of grounds for termination in Arkansas Code Annotated section 9–27–341(b)(3)(B)(i)(a), that the juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent

and correct the conditions that caused removal, those conditions have not been remedied by the parent. Although Laura made progress in complying with the case plan, she could not remedy the situation that caused removal. We affirm the termination of Laura's parental rights.

David's counsel has filed a no-merit brief and motion to withdraw, pursuant to *Linker–Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6–9(i). Counsel's brief contains all rulings from the termination hearing that are adverse to David and states that none of those rulings present an issue of arguable merit for appeal. Our clerk's office mailed a copy of counsel's brief and motion to David at his last known address, informing him of his right to submit points for reversal. David has not filed any pro se points.

Counsel argues that the evidence clearly indicates that termination of David's parental rights was in B.C.'s best interest and that both of the stated statutory grounds for termination were satisfied. Upon examination of the record and counsel's brief, we hold that an appeal $|_{12}$would be wholly frivolous. Accordingly, we grant counsel's motion to withdraw and affirm the termination order.

Affirmed; motion to withdraw granted.

VAUGHT, C.J., and BROWN, J., agree.