Cite as 2020 Ark. App. 337

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CV–20–38

|  |  |
|---|---|
| | **Opinion Delivered:** June 3, 2020 |
| JOSUE TOVIAS<br>APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. 72JV-18-95] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE STACEY ZIMMERMAN, JUDGE |
| APPELLEES | AFFIRMED |

## PHILLIP T. WHITEAKER, Judge

Josue Tovias appeals from a Washington County Circuit Court order terminating his parental rights to JT1, born September 25, 2012, arguing that the circuit court erred in terminating his parental rights because there was insufficient evidence of potential harm to satisfy the best-interest requirement for termination. We affirm.

### I. *Facts and Procedural History*

We have this appeal for the second time after remand. *Tovias v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 228, 575 S.W.3d 621 ("*Tovias I*"). Although we provided a short synopsis of the facts in *Tovias I*, a more detailed recitation of the facts is necessary here.[1]

---

[1]We note that the facts concerning the removal of JT1 were also discussed in *Tovias v. Arkansas Department of Human Services*, 2020 Ark. App. 147, 596 S.W.3d 66, ("*Tovias II*"). *Tovias II* concerned the termination of Tovias's parental rights to another child, JT2, who was born on April 30, 2018, after the institution of these proceedings, and who is not a subject of this termination action.

In January 2018, Tovias was living with his girlfriend, Melissa Miranda; her son, JT1; and her four other children.[2] During that time, law enforcement began an investigation into allegations of abuse and neglect of the children within the home. More specifically, the investigation centered on allegations that one of the children, JF, had been routinely handcuffed to a desk to prevent him from eating, that a knife had been held to his fingers, and that he had been reported to be malnourished, underweight, thin, and bloated. He also had bruises on his wrists and ankles. Both Miranda and Tovias were arrested on charges related to the abuse and neglect,[3] leaving the children without a caregiver. As a result of the abuse and neglect allegations and the absence of a caregiver, DHS exercised a seventy-two-hour hold on all the children and filed a petition for emergency custody and dependency.

After the children were removed from the home, the court adjudicated the children dependent neglected based on the "horrific abuse including routinely handcuffing [JF] to a desk, starving him, and leaving scars on his arms where he was handcuffed on multiple occasions, holding a knife to [JF's] fingers and stating that this is what happens to thieves." Initially, the court ordered the goal of the case to be reunification with a concurring goal of adoption.

DHS subsequently filed a motion to terminate reunification services. The court agreed and ordered no reunification services be provided to either Mirada or Tovias because

---

[2]Tovias has no legal or biological relationship to the other four children—JM1, JM2, JF, and AM—and their rights are not at issue here. Miranda is not a party to this appeal.

[3]Tovias was arrested and charged with second-degree domestic battering, aggravated assault on a family or household member, first-degree endangering the welfare of a minor, tampering with physical evidence, kidnapping, terroristic threatening, and permitting child abuse.

JF had been subjected to extreme or repeated cruelty.[4] The court made a finding of aggravated circumstances and found that there was little likelihood that services to the family would result in successful reunification.

Immediately after ordering no reunification services, the court conducted a permanency-planning hearing. The court noted that while Tovias had made some progress toward alleviating or mitigating the causes of the children's removal from the home and completing the court orders and requirements of the case plan, he had not demonstrated an ability to keep the children safe from harm, which it found to be the most important thing. The court found that the permanent goal for JT1 was adoption with DHS filing a petition for termination of parental rights.

DHS filed its first petition to terminate parental rights on July 10, 2018. After a termination hearing, the circuit court found that DHS had proved aggravated circumstances by clear and convincing evidence and that termination was in JT1's best interest. Tovias appealed, and we reversed and remanded, holding that DHS had failed to establish that Tovias was JT1's parent for the purposes of satisfying the statutory grounds necessary for termination. *Tovias I.*

After remand, the court adjudicated Tovias the biological father of JT1 based on DNA test results. At a special review hearing, the court ordered Tovias to cooperate with DHS; to remain in weekly contact with the family service worker; to inform DHS of any address or telephone number change; to maintain contact with his attorney; to maintain a clean, safe home for himself and JT1; to demonstrate an ability to protect JT1 and keep him

---

[4]Miranda admitted under oath that her actions were extreme and cruel.

safe from harm; and to maintain stable housing and employment. The goal of the case remained adoption.

Approximately one month later, the court held a permanency-planning hearing. The court noted that Tovias had taken parenting classes and had completed counseling. The court found, however, that Tovias had not made measurable, sustainable, or genuine progress toward alleviating or mitigating the causes of JT1's removal from the home or completing the court orders and requirements of the case plan Specifically, the court found that Tovias had subjected JT1 and his siblings to aggravated circumstances by permitting physical abuse, emotional abuse, starvation, and confinement of JT1's sibling and had failed to demonstrate an ability to protect JT1 and keep him safe from harm.

Regarding Tovias's ability to protect, the court was concerned about his relationship with Miranda. In the dependency-neglect proceedings involving JT2, Tovias had testified that he thought Miranda is a good mother and that she had made progress. He further testified that he and Miranda were separated and not then living together. When cross-examination revealed otherwise, Tovias admitted that he had lied because "he didn't want to get her in trouble." At the permanency-planning hearing concerning JT1, Tovias testified that he finally believed that Miranda had abused JF. The court, however, stated that it could not trust that if JT1 was placed with Tovias, he would not be harmed by Tovias or Miranda, whose parental rights had already been terminated.

DHS once again petitioned the court to terminate Tovias's parental rights. This second petition alleged the following grounds: aggravated circumstances, involuntary termination of parental rights to a sibling (JT2), and subsequent other factors. The court

conducted a termination hearing, receiving testimony from only two witnesses: Tovias and Kari Horton, the family service worker.

Horton testified that Tovias had kept DHS informed of his address and phone number; that he had completed his parenting classes; and that he had maintained stable housing and employment. In fact, she testified that Tovias was in full compliance with the case plan and court orders with only one exception: his demonstrated ability to keep JT1 safe from potential harm. Concerning his ability to keep JT1 safe, she testified that the children had been victimized by extreme and repeated cruelty within the home and that Tovias had failed to protect them while the abuse was occurring. She further testified that Tovias was still married to, and still in somewhat regular contact with, Miranda despite the horrific abuse she admittedly inflicted on the children. Even if Tovias were not in a relationship with Miranda, Horton was concerned with his judgment and whether he would protect the child from future abuse by someone else. Additionally, she testified that Tovias still had charges pending against him arising from the initial abuse allegations. As far as adoptability, Horton further testified that JT1 does not have any special needs or behavioral issues that might inhibit adoption.

Tovias testified in his own behalf. Concerning Miranda, he admitted his previous lie under oath about his living arrangements with her and reiterated his reasoning for doing so. He testified that he was currently living alone in his apartment, having separated from Miranda two months prior to the termination hearing. Concerning the abuse within the home, he acknowledged Miranda's admission to physically abusing, starving, and handcuffing his stepson, JF. He testified that while he had initially believed Miranda was a

5

good mother, he had since changed his mind after she had become physically abusive with him earlier in the year. Despite this, he admitted that they were still married and continued to live together even after her admission of cruelty.[5] He claimed he was still married to her only because he could not afford to get a divorce but reported that he would have no problem keeping JT1 safe from her because she would be going to prison for a long time. Concerning his own criminal culpability, he admitted that he still had multiple criminal charges pending regarding his stepson, JF, but reported that he had received word that his charges were going to be dropped.

After hearing the testimony and reviewing the record, the court terminated Tovias's parental rights. In its termination order, the court found that DHS had proved the statutory grounds for termination and that termination was in JT1's best interest. Tovias appeals, challenging only the court's best interest finding.

## II. *Standard of Review and Applicable Law*

Tovias had his natural rights as a parent terminated, which our supreme court has recognized is an extreme remedy. *Earls v. Ark. Dep't of Human Servs.*, 2017 Ark. 171, 518 S.W.3d 81. We review termination-of-parental-rights cases de novo. *Harjo v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 268, 548 S.W.3d 865. We will affirm if at least one statutory ground exists, in addition to a finding that it is in the children's best interest to terminate parental rights. Ark. Code Ann. § 9-27-341 (Supp. 2019); *Kohlman v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595. We will not reverse the circuit court's ruling

---

[5]He claimed that he married her so that he would have more of a say in the placement of JT2.

6

unless its findings are clearly erroneous. *Sharks v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 435, 502 S.W.3d 569. A finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made. *Id.*

On appeal, Tovias does not challenge the circuit court's finding of statutory grounds; instead, he challenges only the circuit's determination that termination was in the best interest of his child. In determining best interest, the circuit court's finding must be based on the consideration of at least two factors: (1) the likelihood of adoption if parental rights are terminated and (2) the potential harm caused by continuing contact with the parent. *Baxter v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 508. It is the overall evidence— not proof of each factor—that must demonstrate termination is in the child's best interest. *Id.*

Here, the circuit court found that JT1 is adoptable, and Tovias does not challenge the court's adoptability finding. He only argues that DHS failed to prove that JT1 faced potential harm if returned to his custody. A potential-harm analysis must be conducted in broad terms, with the circuit court considering the harm to the children's health and safety that might occur from continued contact with the parent. *Barnes v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 525. There is no requirement to find that actual harm would result or to identify the potential harm. *Id.*

The circuit court's findings concerning potential harm and best interest were not clearly erroneous. Tovias's wife, Miranda, horribly abused JT1's half sibling while living with Tovias. The child was handcuffed to a desk in the living room for hours at a time. The child had bruising and was visibly malnourished; yet, Tovias did nothing. He either acquiesced in Miranda's behavior or was so oblivious he could not protect the child. JT1

was present in the home while all this was occurring and witnessed this abuse. Even after Miranda admitted the abuse, Tovias married her. Tovias claims that he wants to divorce Miranda; however, he continued to live with her until shortly before the termination hearing. In fact, he lied to the court about his living arrangements and his relationship with her to prevent her from getting in trouble. The court expressed its concern that, given his past actions, Tovias would not protect JT1 from future harm. A parent's failure to protect provides an adequate basis for finding that a child would be subject to potential harm if returned to the parent and, as such, will support a circuit court's assessment of potential harm. *See Yelvington v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 337, at 6, 580 S.W.3d 874, 878; *Bowman v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 477. Clearly, under these facts, Tovias's failure to protect the children from Miranda is sufficient, in and of itself, to support the circuit court's potential-harm finding.

In light of the foregoing, we cannot conclude that the circuit court's best-interest finding was clearly erroneous and therefore affirm the termination of Tovias's parental rights to JT1.

Affirmed.

KLAPPENBACH and VAUGHT, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Callie Corbyn*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor child.