Cite as 2021 Ark. App. 149

# ARKANSAS COURT OF APPEALS
DIVISION IV
№. CV-20-648

| | |
|---|---|
| KOURTNEY NOE<br><br>APPELLANT<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | OPINION DELIVERED: APRIL 7, 2021<br><br>APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT<br>[NO. 16JJV-19-141]<br><br>HONORABLE MELISSA BRISTOW RICHARDSON, JUDGE<br><br>AFFIRMED |

## ROBERT J. GLADWIN, Judge

Kourtney Noe appeals the Craighead County Circuit Court's order terminating her parental rights to her sons, AN1, born August 6, 2010; and AN2, born May 18, 2012. She argues that the circuit court clearly erred in finding that termination was in the boys' best interest. We affirm.

### I. *Facts*

On April 15, 2019, appellee Arkansas Department of Human Services (DHS) filed a petition alleging that both boys were dependent-neglected as a result of abuse, neglect, or parental unfitness. An ex parte order for emergency custody was granted to DHS based on the allegations in the affidavit attached to the petition.

The affidavit reflects that the boys had been in foster care from June 29, 2017, until August 10, 2018, when they were returned to Kourtney's custody. Shortly thereafter, on

October 27, a DHS differential-response case was opened when police found Kourtney asleep in the front seat of her car at a Taco Bell. Kourtney told the officers that she had "three shots and two beers." Officers searched her car and found digital scales and a small baggy containing suspected methamphetamine. Kourtney was charged with possession of methamphetamine or cocaine, less than two grams; possession of drug paraphernalia; and driving while intoxicated, first offense.

On January 23, 2019, a protective-services case was opened because Kourtney admitted giving AN1's attention-deficit hyperactivity-disorder medication to AN2. On April 10, the Jonesboro Police Department informed DHS that Kourtney had been arrested and incarcerated and that there was no caregiver for the boys. Police advised that Lynn and Judy Sharp, maternal grandparents, had received a call from Cherish Bogard, who asked if they could "get the boys." The Sharps asked Bogard to contact DHS or the police. Thereafter, police located the boys at 1100 Cartwright Street, which was a residence known to the police for criminal activity. The boys were with Judy Lock, who stated that Kourtney would often leave the boys with her and that she had no clothing or medication for them. She had asked Bogard to contact the Sharps. DHS placed a seventy-two-hour hold on the boys, who described during transport to their placement that Lock's husband had threatened them with a gun, that Lock's son had been fighting with another man over a gun, and they had been threatened with a knife.

A probable-cause hearing was held on April 18, and Kourtney stipulated both to the facts alleged in the affidavit and that DHS had made reasonable efforts with the family in the past. The circuit court found probable cause that the emergency conditions that caused

removal from Kourtney's custody continued and that it was necessary for DHS to maintain custody of the boys. Kourtney was granted supervised visitation, and DHS was ordered to assess the Sharps as potential placement alternatives. Kourtney was ordered to complete the standard welfare orders; submit to a drug-and-alcohol assessment and follow the recommendations; attend and participate in counseling; attend AA/NA meetings; and submit to inpatient long-term substance-abuse treatment.

The boys were adjudicated dependent-neglected after a hearing on May 16, and the finding was based on neglect and parental unfitness.[1] DHS was found to have made reasonable efforts to prevent removal. The court noted that Kourtney admitted drug use and abuse; that she was facing felony drug charges; that she chose to leave the children at an inappropriate placement at which they were threatened with a knife and a gun; and that she failed to provide proper clothing and medication for them. A reunification goal was established.

DHS filed a motion to terminate reunification services on May 19 alleging that the children had been subjected to aggravated circumstances and citing the facts as alleged in the affidavit attached to its original petition. DHS also alleged that Kourtney had tested positive for methamphetamine and amphetamines on April 18 and that on May 3, she had tested positive for marijuana. DHS claimed that the boys were back in DHS custody only eight months after custody had been returned to Kourtney in August 2018, and the previous and current cases shared the same issues that prevented return of the boys to Kourtney's

---

[1]The court found that Jefferson Andrew Noe, Jr., is the boys' putative father and had not established significant contacts with them, and he was not made a party in this case.

3

custody—substance abuse and inappropriate housing—despite the family being offered numerous services in the previous and current cases.[2] Further, Kourtney was facing pending felony drug charges. DHS argued that Kourtney's situation demonstrated that she did not benefit from the services previously offered and that the circuit court should make a determination that there is little likelihood that offering further services would result in successful reunification.

A hearing was held on June 28, and the court granted the motion to terminate reunification services, finding that it was in the boys' best interest. The court cited the previous DHS protective-services case, Kourtney's admitted recent drug use and positive tests for methamphetamine and amphetamines, and the family's inappropriate and unstable housing. The court ordered that all reunification services cease and that visitation would continue.

A permanency-planning order also resulted from the June 28 hearing. The court found that Kourtney was in partial compliance with the case plan and court orders in that she was in inpatient substance-abuse treatment, had watched "The Clock is Ticking" video, and had completed parenting classes. The court found that she had not provided DHS with proof of employment, attended support groups, or gained or maintained stable housing. The goal of the case was changed to guardianship with Lynn and Judy Sharp.

---

[2]The previous case offered the following services: home visits, visitation, psychological evaluation, parenting classes, drug-and-alcohol assessment and recommended treatment, hair-follicle testing, drug screening, inpatient substance-abuse treatment, housing referrals, employment-services referrals, outpatient substance-abuse partial-day treatment and group therapy, and mental-health therapy.

4

A review hearing was held on October 8, and the court found that Kourtney had not provided DHS with proof of employment, housing, or completion of other services. The goal of the case was subsidized guardianship with Lynn and Judy Sharp, and a concurrent goal was not ordered.

On February 12, 2020, DHS filed a petition for appointment of Judy and Lynn Sharp as guardians of the person of both boys. The petition alleged that Kourtney was allowed supervised visitation for at least four hours a week, with the Sharps having discretion to expand it. An "Agreed Review Order" was filed on April 6, and the guardianship goal remained.

On June 4, DHS filed a petition for termination of parental rights (TPR). It alleged the following grounds: (1) the court had found the boys dependent-neglected as a result of neglect or abuse that could endanger their lives, which was perpetrated by Kourtney. Ark. Code Ann. § 9-27-341(b)(3)(B)(vi)*(a)* (Repl. 2020); and (2) Kourtney was found to have subjected the boys to aggravated circumstances, meaning that there is little likelihood that services to the family would result in successful reunification or that the boys had been neglected or abused to the extent that the abuse or neglect could endanger their lives. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)* & *(iii)*.

In its petition, DHS alleged facts on which it relied to support the statutory grounds. These facts included those alleged in the original petition and added that on September 1, 2016, Michael Anchor, Kourtney's boyfriend, was found to have spanked AN1, leaving bruises and welts on his legs and that when the family moved to Texas, DHS closed its protective-services case. It explained that on June 15, 2017, DHS again became involved

5

with the family when Kourtney did not have stable housing and tested positive for methamphetamine and amphetamines. Also, on January 23, 2020, Kourtney had pleaded guilty to DWI and possession-of-drug-paraphernalia charges, and she was sentenced to thirty-six months' probation and twelve months' suspended imposition of sentence. Finally, DHS alleged that Kourtney is living with Michael, a previous offender who had given AN1 bruises and welts.

A permanency-planning hearing was held on June 5, and the circuit court found that DHS had made reasonable efforts to provide services to the family. The court found that Kourtney had not maintained sobriety given her admission of recent marijuana use and her guilty plea to a drug-paraphernalia charge. Further, Kourtney is living with Michael, who has a true finding against him for giving bruises and welts to AN1. The court set concurrent goals of adoption and guardianship with Judy and Lynn Sharp and ordered that the boys remain in DHS's custody. The court ordered that DHS could drug screen Kourtney before visits if necessary, and no other services were ordered.

At the TPR hearing, Kourtney testified that she lives with Michael and that his placement on the child-maltreatment registry is being appealed. She said that she had never known Michael to physically discipline the boys and that she did not know of the 2016 allegation against him regarding AN1 until June 2020. She said that if that finding were not overturned, she would move out and that she would do what she had to do for her kids. She said that she had completed drug-abuse treatment and that she had stopped using methamphetamine. She said that she has had a job at Buffalo Wild Wings since February

2020. She acknowledged DHS involvement with her family since 2015, and she asked that guardianship be given to her parents rather than termination of her parental rights.

Judy Sharp testified that the boys are her grandchildren and that they have been in her home for almost four years. She said that she "had been of the mindset" that she wanted guardianship but that her feelings changed. She said that she and her husband had asked about adoption and guardianship and discussed what would be best for the boys. She said, "They kept saying guardianship, guardianship." She said that she and her husband did not understand the subsidized guardianship and could not get anyone to explain it to them. She said that they have asked about adoption "ever since it started." She said that she thought adoption over a guardianship was in the boys' best interest because they needed a stable place where they would not be dragged back and forth. She said that she supervises the visits between Kourtney and the boys, and she has never witnessed Kourtney say anything inappropriate to them. She said that Kourtney talked about the boys "coming home and stuff." She said that it concerned her that Kourtney had said that "in the middle of the case." She felt like there would be potential harm in returning the boys to Kourtney because of the drugs, "the boyfriend," and the boys' not eating and not being properly dressed. On cross-examination, she said that when she saw the bruises on AN1, Kourtney told her that Michael had whipped him. She said that Kourtney had not visited the boys in a month or two and that if parental rights were terminated, she would not allow Kourtney to visit.

Lynn Sharp testified that he is the boys' grandfather and that they had been living with him "off and on" since 2016. He described his reaction when he saw the bruises on AN1. He said that he told Kourtney he was going to "get" Michael. Kourtney defended

7

Michael and agreed to sign over guardianship so that Lynn and Judy could register the boys for school. He said that he had been in fear for the children's safety in Michael's home that Kourtney shares with him and that he is concerned over the same issue now. He said that when Kourtney visited the boys at his house, the boys acted out, and Kourtney did not give them structure or guidelines. He said that he is now asking for adoption rather than guardianship in order to give the boys permanency and that he would like to raise the two boys as his own.

Kendra Webb, a program assistant at DHS, testified that she supervised visitation about fourteen times and that she had concerns over Kourtney's lack of parenting skills. Gregory Daffron, a family service worker for DHS, testified about the history of the case and the services that had been provided. He said that when he went to the Sharps' house to get them to sign paperwork for the subsidized guardianship, they informed him that they never really wanted guardianship and that they wanted to adopt. He said that adoption would be in the boys' best interest because they would find permanency with the Sharps, they would be entitled to benefits that the Sharps have now or would have in the future, and he thought it would be better in the long run for an adoption to take place. He said that he had done a home visit with Kourtney and Michael, and the home is unfinished, having exposed wires and incomplete rooms. He said that there were broken-down vehicles in the yard along with random and rusty metal pieces. He said that there was running water in the home, but it was more like a "trickle." He said that there were no barriers to adoption and that the Sharps definitely wanted to adopt the boys.

Kourtney testified again, and she stated that she had spanked AN1 with a belt because he had been suspended from school. She said that Michael never touched the boys and that she was the one who had actually spanked them. She said that she never saw the bruises and that if they had been there, the bruising had occurred while the boys were in her dad's or her grandfather's care. She said that she was messed up at that time, but she did not remember seeing the marks. She said that she is a different person than she was then, she had been to drug-abuse treatment, and that if anyone physically abused her children, she would "leave." She also said that she would abide by any court order not to use physical discipline on the boys.

The circuit court granted DHS's TPR petition. It addressed Kourtney's argument that guardianship should be granted over adoption as follows:

> Lastly, I want to address the constitutional argument. I do agree with Mr. Dunigan [Kourtney's counsel] that termination is an extreme remedy. I disagree that it is unconstitutional if there is any other alternative to adoption. The court is recognizing that the state has a compelling interest in child protection and that continued instability, continued exposures to individuals such [as] at the beginning of this case who were inappropriate around the children and caused them to feel threatened, other circumstances with regard to [Michael], which I've already been through and will not restate for purposes of the record. And overall, [Kourtney's] just lack of judgment and lack of prioritizing her children in the circumstance convince me that these children's protection is paramount and is a compelling interest and it is warranted and that termination will clearly serve as their best interest because it will provide the permanency for these boys that they are not going to have to wonder or risk being removed from the Sharp[s]' home.
>
> The Court would also note that certainly if the Sharps are granted adoption in this case, that Mr. Sharp is [Kourtney's] father. And that while the testimony today is that under the current circumstances and given [Kourtney's] current behaviors and circumstances, that they would not envision visitation. If they are adoptive parents, that is something that they can decide to do or not to do in the future depending on the circumstances. And so while the termination is not so that the Sharps can adopt so much. It is granted based upon the other circumstances that I have articulated in this ruling with regard to [DHS] having met its burden of proof. But it also bears

9

noting that Mr. Sharp is related to the children and related to [Kourtney]. But I am not finding the termination statute is unconstitutional if it is possible to achieve a guardianship or a long-term placement. I do not believe that to be consistent with the law. I do believe that child protection is a compelling state interest and that [DHS] has more than met its burden of proof by clear and convincing evidence in this circumstance such that termination of parental rights should be granted as the ground for termination has been met, and it is in the best interest of the children given that potential harm would occur to them, and they are adoptable.

A TPR order was filed on August 21, 2020, and termination was based on the statutory ground of aggravated circumstances. The court found that it was in the boys' best interest to terminate parental rights, that the Sharps would likely adopt the boys, and that the boys would be subjected to potential harm if returned to Kourtney. The order states, "The court rejects [Kourtney's] argument that the court cannot terminate her parental rights if there is another remedy available that [she] considers to be less restrictive as the court finds the stability of the children are paramount in this matter." Kourtney filed a timely notice of appeal, and this appeal followed.

II. *Standard of Review and Applicable Law*

We review termination-of-parental-rights cases de novo. *M.S. v. Ark. Dep't of Human Servs.*, 2021 Ark. App. 77, 617 S.W.3d 731. At least one statutory ground must exist, in addition to finding that is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Repl. 2020). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Musick v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 87, 595 S.W.3d 406. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to

support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

In making a "best interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent. *Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, at 2, 434 S.W.3d 378, 380; *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1. The potential-harm inquiry is but one of the many factors that a court may consider, and the focus is on the potential harm to the health and safety of a child that might result from continued contact with the parent. *Tadlock v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 841, 372 S.W.3d 403. The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Id.* Furthermore, the potential-harm analysis should be conducted in broad terms. *Id.* "Stability and permanence for children are the objectives of the TPR procedure, and living in continued uncertainty is itself potentially harmful to the children." *See Bean v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 77, at 30, 513 S.W.3d 859, 877.

> The TPR statute sets out two factors that must be considered by the circuit court when the court determines whether TPR is in the children's best interest— likelihood of adoptability and potential harm. *See Chaffin v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 522, at 5, 471 S.W.3d 251, 255. Considerations in making a best-interest finding may include: the preservation of the children's relationship with a grandparent; the severance of child support from a parent; whether a less drastic measure could be employed such as a no-contact order or supervised visitation; whether continued contact with the parent would be beneficial to the children if or when the children are living with a relative and not in an indeterminate state that is working against them; and whether the children are living in continued uncertainty.

*Phillips v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 383, at 12, 585 S.W.3d 703, 709–10.

Finally, we have held that "[a] parent's failure to protect provides an adequate basis for

11

finding that a child would be subject to potential harm if returned to the parent and, as such, will support a circuit court's assessment of potential harm." *Tovias v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 337, at 8, 601 S.W.3d 161, 166.

### III.  *Best-Interest Analysis*

Kourtney does not challenge the circuit court's finding of aggravated circumstances. Instead, she challenges the circuit court's finding that termination of her parental rights was in the boys' best interest. She argues that DHS relied on Michael's child-maltreatment true finding and her potential for continued substance abuse to support its potential-harm argument. She contends that her testimony was that she was unaware of the true finding until a week before the June 5, 2020 hearing, which was a month before the termination hearing, and that she indicated that she was never contacted or interviewed by DHS regarding the allegation. She asserts that Michael's true finding is on appeal. She also claims that her potential for continued substance abuse was mitigated by her completion of inpatient substance-abuse treatment.

Kourtney also contends that other considerations in making a best-interest finding are whether a less drastic measure—short of terminating parental rights—could be employed and whether the children are living with a relative and not in an indeterminate state that is working against them. *Phillips*, *supra*. She contends that she specifically argued below that there was a less drastic measure that the circuit court could implement by way of the subsidized guardianship, especially given that the boys were in their maternal grandparents' home and not in an indeterminate state. She asserts that the goal throughout most of the case was subsidized guardianship with the Sharps. She argues that the less drastic alternative

was available in this case and that the circuit court erred in finding that it was in the boys' best interest to terminate her parental rights.

We hold that the circuit court's best-interest determination was not clearly erroneous. There was evidence presented that both Kourtney's boyfriend and her unsafe housing presented a risk of potential harm to the boys. Judy Sharp testified that when she discovered bruises and welts on AN1, Kourtney told her that Michael had whipped him, and Lynn Sharp confirmed this testimony. Kourtney retook the witness stand and said that she had spanked the child, Michael had never touched her children, and someone else may have been responsible for the child's bruising. The circuit court found that Kourtney's testimony was not credible. Kourtney asks this court to act as a super fact-finder, substituting our judgment or second-guessing the credibility determination of the circuit court, which appellate courts will not do. *Robinson v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 251, at 4, 520 S.W.3d 702, 704. Determinations of credibility are left to the fact-finder. *Guerrero v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 428.

Further, the testimony regarding Kourtney's unsafe house—exposed wires, rusty metal in the yard, missing drywall—was evidence of risk of harm if the boys were returned to Kourtney. Finally, Kourtney admitted marijuana use as late as June 2020. A parent's continued drug use can be considered evidence of potential harm. *See Harjo v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 268, 548 S.W.3d 856. Therefore, the circuit court's potential-harm finding was well supported by the same evidence that proved the uncontested grounds. *Taylor v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 264, at 12.

Kourtney's reliance on *Phillips*, *supra*, for her less-restrictive-alternative argument is misplaced. First, the boys were in DHS custody; thus, the rationale in *Phillips* favoring a less restrictive alternative to termination of parental rights when a child is in the custody of a relative does not apply. *Phillips*, 2019 Ark. App. 383, at 13–14, 585 S.W.3d at 710. Second, as in *Phillips*, there was no reasonable prospect that Kourtney would reunify with the boys as demonstrated by her failure to challenge the statutory grounds at the termination hearing or on appeal. *Id*. at 16, 585 S.W.3d at 711. Third, the Sharps were not willing to accept guardianship and expressed their desire to adopt. The permanency-planning statute provides that guardianship is a placement goal when the relative is "fit and willing." Citing the need for stability and permanency, the Sharps' testimony that they wanted to adopt rather than obtain a subsidized guardianship was unequivocal. Ark. Code Ann. § 9-27-338(c)(4) (Repl. 2020). Accordingly, we affirm.

Affirmed.

VIRDEN and WHITEAKER, JJ., agree.

*Streit & Streit*, by: *Jonathan R. Streit*, for appellant.

*Callie Corbyn*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Casey D. Copeland*, attorney ad litem for minor children.