2011 Ark. App. 673

**Melissa LANDIS–MAYNARD and Tommy Dale Niccum, II, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

No. CA 11–727.

Court of Appeals of Arkansas.

Nov. 9, 2011.

Deborah Ruth Sallings, Little Rock, Janet Renee' Lawrence, Coneway, for appellant.

Tabith Baertels McNulty, Little Rock, Melissa Bristow Richardson, Jonesboro, for appellee.

LARRY D. VAUGHT, Chief Judge.

Melissa Landis–Maynard and Tommy Dale Niccum appeal from an order terminating their parental rights in their three-year-old son, T.N. Landis–Maynard's attorney has filed a no-merit brief and motion to withdraw, stating that there are no issues of arguable merit for appeal. _Linker–Flores v. Ark. Dep't of Human Servs._, 359 Ark. 131, 194 S.W.3d 739 (2004); Ark. Sup.Ct. R. 6–9(i) (2011). Niccum, who is represented by separate counsel, seeks reversal on the grounds that termination was not in the child's best interest and that the Arkansas Department of Human Services (DHS) did not make meaningful efforts to rehabilitate him. We affirm the termination order as to both parents and grant Landis–Maynard's counsel's motion to withdraw.

## I. _Factual Background_

Melissa Landis gave birth to T.N. when she was seventeen years old. The father, Tommy Niccum, was fourteen. Not long after the child's birth in March 2008, Landis married Patrick Maynard. Niccum continued to live at home with his mother.

On September 16, 2009, DHS received a report that T.N. had been injured and that Patrick Maynard did not like the child. An investigation revealed that T.N. had bruises on his face and ear, and scratches and bruises on his thigh and testicles. Upon being questioned by a DHS worker, Melissa Landis–Maynard could not identify a specific incident that corresponded to the injuries. She told the worker that T.N. fell a lot, sometimes hit himself with his toys, and may have been scratched by the family dog. DHS placed a seventy-two-hour hold on T.N. and obtained emergency custody of him on September 21, 2009. A probable-cause order was entered several days later, maintaining custody with DHS.

At a November 6, 2009 hearing, the circuit court adjudicated T.N. dependent-neglected due to physical abuse by "the father," meaning the stepfather, Patrick Maynard. The court established a goal of reunification and ordered the mother to accomplish various tasks, including attending and completing parenting-without-violence classes; attending and completing a drug-and-alcohol assessment and complying with recommendations; attending and completing a psychological evaluation and complying with recommendations; and obtaining and maintaining appropriate housing, income, and transportation. The court also ordered that Patrick Maynard have no contact with T.N.

Following the adjudication hearing, DHS developed a case plan, which provided, in part, that the mother should have no contact with Patrick Maynard. The plan also declared an intention to refer Tommy Niccum for DNA testing and, if paternity could be established, to have Niccum complete parenting classes; undergo a drug-and-alcohol assessment and a psychological evaluation; maintain stable housing, income, and transportation; and visit T.N. regularly. Subsequent genetic testing established Niccum's paternity, and the court declared Niccum to be T.N.'s father following an April 9, 2010 review hearing. The court also continued the goal of reunification with the mother and granted Niccum visitation upon completing parenting

classes, with the proviso that visitation would not occur if Niccum were intoxicated.[1]

On May 26, 2010, Niccum attended a DHS staffing and signed the case plan. By the time of a September 13, 2010 permanency-planning hearing, however, Niccum had not completed parenting classes, had not submitted to a psychological evaluation or drug-and-alcohol assessment, and was living in unstable housing with his mother. Similarly, Melissa Landis–Maynard had failed to comply with virtually all aspects of the case plan and court orders, and she continued to reside with Patrick Maynard. The court changed the goal of the case to termination of parental rights and adoption. The order recited that DHS provided several services during the case and made reasonable efforts to achieve a goal of permanency.

In the ensuing months, Niccum completed parenting classes and submitted to a psychological evaluation, completing it a few weeks before the January 2011 termination hearing. Niccum did not attend a drug-and-alcohol assessment, despite having received a referral from DHS in August 2010.

The termination hearing was held on January 24, 2011. Landis–Maynard testified that she had no funds and owed money for utility bills and a traffic fine. She also stated that she had not completed parenting-without-violence classes and that she had recently given birth to a child with Patrick Maynard. She said that she had seen Maynard just two or three weeks before the hearing and that she was aware that Maynard had been arrested for neglecting or harming another child. She acknowledged that, during her pregnancy, she made two police reports against Maynard for inflicting physical abuse on her.

She did not, however, believe that Maynard had abused T.N.

Niccum, who was seventeen at the time of the hearing, testified that he lived with his mother and her boyfriend and that he had stopped attending high school after the tenth grade in order to enroll at a day treatment center. He completed his time at the center in May 2010 but did not attend school or take GED classes thereafter. He testified that his high school would not let him return because he did not have an original copy of his birth certificate. On the Monday before the hearing, he began working at a pizza parlor. Niccum stated that he planned to get a driver's license when he turned eighteen.

Niccum explained that he had not attended the drug-and-alcohol assessment for which he received the referral because it was too far from his home. He denied drinking alcohol and said that several empty alcohol bottles, which a DHS worker observed in his room, came from a friend's house and were there for decoration.

DHS caseworker Robbie McKay testified that she had observed Melissa Landis–Maynard with injuries to her face and neck during the case and with a black eye as recently as a month and a half before the hearing. McKay also said that she had offered to provide transportation to Niccum to attend the drug-and-alcohol assessment but received no response. She additionally questioned Niccum's claim that he had not returned to school for want of a birth certificate. She testified that he was still enrolled in school while at the day treatment center and that she knew of no requirement that he re-present his birth certificate. McKay stated further that Niccum's home was not appropriate for T.N. because there were alcohol bottles on

---

1. For reasons not explained in the record, the order from the April 9, 2010 review hearing was not filed until January 21, 2011. The court did file an order on April 27, 2010, establishing Niccum's paternity.

Niccum's couch and dresser, a knife on the floor, tools lying around, and an air-gun on the couch. Finally, McKay testified that T.N.'s foster parents had expressed an interest in adopting him and that she saw no impediments to the adoption.

Niccum's mother, Stacy Lynn Schwennly, agreed that her home was not currently appropriate for a child but said that things could be fixed up rather quickly. She testified that Niccum saw T.N. often before the child went into DHS custody and that Niccum bathed and fed the child. On cross-examination, Schwennly admitted that Niccum and her boyfriend had gotten into an altercation that resulted in the boyfriend going to jail for threatening to shoot Niccum.

In addition to the above testimony, DHS introduced Niccum's psychological evaluation, which revealed that he had dropped out of school in the tenth grade "because it would be easy"; that he had a history of legal problems due to arguing and fighting; that he had been diagnosed with explosive disorder, major depression, anxiety, and ADHD, for which he had entered the day treatment center; and that he had stopped taking his medication. Also introduced was a CASA report indicating that Landis–Maynard had recently been fired from her job for lateness, rudeness, and inattention to her duties, and that Niccum had not followed up on outpatient treatment after his discharge from the day treatment center.

On April 20, 2011, the circuit court entered an order terminating Landis–Maynard's and Niccum's parental rights in T.N. The court noted the mother's lack of compliance with the case plan and her continued contact with Patrick Maynard, and the father's inability to meet T.N.'s needs in light of his just beginning his first job, his reliance on his mother and her boyfriend for support, and the instability and violence in that household. Both parents filed timely notices of appeal.

## II. Landis–Maynard's No–Merit Appeal

We agree with counsel that the termination decision as to Melissa Landis–Maynard presents no issues of arguable merit for appeal. DHS established a permanency-planning goal of adoption, and the circuit court heard evidence that T.N.'s foster parents had expressed interest in adopting him, with no impediments to the adoption. During the sixteen-month case, Landis–Maynard remained financially unstable and could not hold a regular job. She did not complete parenting-without-violence classes as ordered by the court and attended only three of eighteen sessions. She also maintained a relationship with Patrick Maynard and had another child with him, despite his propensity for extreme violence toward her and despite knowing that her continued contact with him could affect her ability to regain custody of T.N.

A parent's unstable living and financial situation and volatile and abusive relationships demonstrate potential harm in returning the child to the parent. Dority v. Ark. Dep't of Human Servs., 2011 Ark. App. 295, at 7, 2011 WL 1495988. Further, where a parent stands by a perpetrator of abuse and steadfastly refuses to believe that the perpetrator has abused her child, despite the court's having made such a finding at the adjudication hearing, a termination order may be affirmed. See Sparkman v. Ark. Dep't of Human Servs., 96 Ark.App. 363, 365–66, 242 S.W.3d 282, 284 (2006); Wright v. Ark. Dep't of Human Servs., 83 Ark.App. 1, 5–6, 115 S.W.3d 332, 334–35 (2003). Given these authorities and DHS's proof in this case, any appeal from the termination order would be wholly without merit.

Likewise, two adverse evidentiary rulings at the termination hearing reveal no meritorious grounds for reversal, given that Landis–Maynard could not possibly demonstrate prejudice from either ruling. *Carpenter v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 340, at 4, 2009 WL 1153245. We therefore affirm the termination ruling as to Landis–Maynard and grant counsel's motion to withdraw.

### III.  *Niccum's Appeal—Reasonable Services*

█ Once a child has been adjudicated dependent-neglected, there is a presumption that DHS will provide services to preserve and strengthen the family unit. *Tuck v. Ark. Dep't of Human Servs.*, 103 Ark.App. 263, 266, 288 S.W.3d 665, 668 (2008). Niccum argues that DHS's efforts in this regard were not meaningful or reasonable.

█ The record does not reflect that Niccum raised this argument to the circuit court. We will not address a reasonable-efforts argument for the first time on appeal. *Kelley v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 481, at 4, 2011 WL 2577561. Moreover, the circuit court made a finding of reasonable efforts in the permanency-planning order, and Niccum did not appeal from the |₈finding in that order. He has therefore waived consideration of this issue on appeal. *Kelley*, 2011 Ark. App. 481, at 5, 2011 WL 2577561.

█ In any event, Niccum's argument on this point is not well taken. DHS made several services available to Niccum: referrals for paternity testing, parenting classes, a psychological evaluation, and a drug-and-alcohol assessment, as well as offers of transportation assistance. Niccum utilized some of these services after the court set a date for the termination hearing but did not undergo a drug-and-alcohol assessment. He argues that he was unable to attend the assessment because it was too far from his home. The DHS caseworker testified, however, that she offered Niccum transportation to the assessment locale but that Niccum did not respond.

Niccum also contends that DHS failed to provide him with information about keeping his home safe for a child. Yet, he underwent parenting classes and had supervised visits with T.N., thereby receiving parenting instruction. He also claims that he had only a short time to take advantage of DHS services. In fact, he had approximately eight months, during which he was not employed or in school. Niccum further asserts that he did not receive a referral for anger-management classes as recommended in the psychological evaluation. The psychological evaluation was not completed by Niccum until December 2010, and DHS did not receive the evaluation until approximately two weeks before the January 2011 termination hearing. Niccum offers no convincing argument why DHS should have prolonged the sixteen-month-old case for him to complete anger-management classes, especially in light of the fact that he sought no continuance from the circuit court on that basis.

|₉For these reasons, we decline to reverse on this issue.

### IV.  *Niccum's Appeal—Best Interest*

█ A termination decision must be based on clear and convincing evidence that termination is in the child's best interest, taking into consideration the child's likelihood of adoption and the potential harm in returning the child to the parent. Ark.Code Ann. § 9–27–341(b)(3)(A)(i) & (ii) (Supp.2011). Niccum contends that termination was not in T.N.'s best interest because he had a bond with T.N. and was not the offending parent who caused T.N.'s removal from the home. We see no reversible error.

While it is true that Niccum was not the offending parent at the outset of the case, once he became part of the proceedings, the court received evidence that Niccum was a young man who cavalierly stopped his education in the tenth grade and undertook no other significant education or work activity until the week before the termination hearing. The evidence also showed that Niccum remained at the mercy of his mother and her boyfriend for transportation and basic support, and the environment in the household was a volatile one—the boyfriend was arrested for threatening to shoot Niccum following an argument. Additionally, the proof showed that Niccum was diagnosed with intermittent-explosive disorder and had a history of legal trouble due to arguing and fighting yet was apparently taking no medication and had not followed up on outpatient treatment.

In conducting the best-interest analysis, the focus is on the potential harm that might result from continued contact with the parent. The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Cariker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 574, at 10, 385 S.W.3d 859, 865. Furthermore, the potential-harm analysis should be conducted in broad terms. *Id.* at 10, 385 S.W.3d at 865. The circuit court may well have concluded that the evidence outlined above demonstrated potential harm in placing T.N. with Niccum. A child is subject to potential harm if he is placed in a volatile environment with persons who have unresolved mental-health issues. *Masterson–Heard v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 623, at 4, 2010 WL 3686822. Further, the court heard evidence that the seventeen-year-old Niccum consumed alcohol in his home, as shown by the many empty bottles in his room, yet did not attend the drug-and-alcohol assessment for which he was referred. Given these circumstances, we cannot say that the circuit court clearly erred in ruling that termination of Niccum's parental rights was in T.N.'s best interest.

Affirmed, and motion to withdraw granted as to Landis–Maynard; affirmed as to Niccum.

GLADWIN and MARTIN, JJ., agree.