

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-16-33

MIKE GEATCHES
AMY GEATCHES

APPELLANTS

V.

ARKANSAS DEPARTMENT OF HUMAN
SERVICES AND MINOR CHILDREN

APPELLEES

**Opinion Delivered** June 22, 2016

APPEAL FROM THE CRAWFORD
COUNTY CIRCUIT COURT
[NO. 17JV-14-58]

HONORABLE MICHAEL MEDLOCK,
JUDGE

AFFIRMED AS TO AMY GEATCHES;
SUPPLEMENTATION OF THE RECORD AND
REBRIEFING ORDERED; MOTION TO
WITHDRAW DENIED AS TO MIKE
GEATCHES

## LARRY D. VAUGHT, Judge

Mike and Amy Geatches appeal the Crawford County Circuit Court's orders terminating their parental rights to two minor children, C.S. and G.G.[1] Mike's appellate counsel filed a motion to withdraw and a no-merit brief pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004) (*Linker-Flores (I)*), while Amy filed a merits brief challenging the circuit court's findings as to statutory grounds and best interest. We affirm the termination of Amy's parental rights. We deny Mike's counsel's motion to withdraw and order rebriefing and supplementation of the record.

---

[1] Separate termination orders were entered for each parent. Mike's parental rights were terminated as to C.S., despite the fact that DHS filed an amended petition naming another man as C.S.'s father and Amy's testimony that C.S. was her child from another relationship. There was also conflicting evidence in the record regarding C.S.'s paternity.

SLIP OPINION

In 2014, Mike and Amy were arrested on multiple counts of fraud, prompting the removal of C.S. and G.G. from their custody. While in DHS care, the children revealed that they had been living in hotel rooms and the family's van and had not attended school. DHS filed a petition for emergency custody due to dependency-neglect, which the court granted on March 21, 2014. Five days later, the court found probable cause for the children to remain in DHS custody. In the probable-cause order, the court instructed DHS to provide notice to the Cherokee Nation of Oklahoma pursuant to the Indian Child Welfare Act of 1978 (ICWA), codified at 25 U.S.C. §§ 1901–1963.

The children were adjudicated dependent-neglected on June 19, 2014. The case goal was set as reunification, and the parents were ordered to provide DHS with their current address and contact information, obtain and maintain safe and stable housing, attend and complete psychological evaluations and any resulting recommendations regarding psychological care, attend and complete parenting classes, obtain and maintain legitimate income, and resolve all pending criminal charges.

A review hearing was held on October 2, 2014, during which the court considered recommendations of a representative of the Cherokee Nation of Oklahoma and found that immediately returning the children to either parent would result in serious emotional or physical harm. The court maintained the case plan as reunification but found that the parents had only partially complied with previous court orders. They had obtained safe and stable housing, and Amy had obtained employment, but the court noted that it was significant that neither parent had disclosed to DHS or the court that they had outstanding criminal charges and fines in other states, had a history of child maltreatment in other states, and that Mike had

a previous true finding for sexual abuse against a child in Indiana. The court developed a new case plan to address these issues. Visitation with the children was suspended due to the existence of an ongoing investigation of sexual abuse against the children by one or both of the parents.

On December 11, 2014, the court held another review hearing, as a result of which it changed the case goal to termination of parental rights and adoption. At that hearing, the court again found that the couple had partially complied with the case plan but that Mike was now incarcerated due to new criminal charges for raping his daughter, G.G.

On December 22, 2014, DHS filed a petition to terminate both parents' parental rights. After multiple continuances, the court held bifurcated termination hearings for each parent[2] on June 2, 2015. In the hearing for Mike, the evidence was minimal because he admitted having pleaded guilty to second-degree sexual assault against G.G., for which he had been sentenced to twelve years in the Arkansas Department of Correction and fined $15,000. Mike acknowledged that C.S. had attended only one semester of kindergarten. He said that the children had been "home schooled" but that they did not follow any sort of curriculum and instead just "talked about stuff." The DHS worker testified that he recommended termination of Mike's parental rights as to both children because Mike had molested G.G., the children were adoptable, and there were no more services that DHS could offer that would be likely to remedy the causes of removal. He also noted that the children were afraid of Mike and did not want to return home. A representative of the Cherokee Nation also recommended termination

---

[2] DHS requested bifurcated hearings so that Mike could be removed from the court room while G.G. testified in Amy's hearing.

and expressed the opinion that the children would suffer serious emotional and physical harm if returned to Mike's custody. The court ruled from the bench that it would issue a written order terminating Mike's parental rights.

The court then proceeded with the termination hearing as to Amy. G.G. testified that she was eight years old and attended the first grade. She stated that she had never attended school before this year, that she did not know how to read when she started school, and that she had had to "work extra hard" to catch up. When asked what she liked about living with her foster family, she stated that "they feed me every – like, breakfast, lunch, and dinner." She testified that, when she lived with her parents, they lived in hotels, they only fed her "at the end of the day," and "sometimes they would steal stuff." She stated that she and her brother did not go to school when they lived with her parents. They would spend their days at Wal-Mart or in the car. G.G. testified that at night Mike would take her to his bed, take her clothes off, kiss her lips, and put his fingers on her private parts. She said that she told her mom about this and that her mom didn't do anything about it. She stated that she did not want to go home and that she was angry at her father. She stated that her mother had not done anything bad to her, other than not doing anything to protect her from her father's abuse. G.G. stated that her mother only touched her private parts to "check for infections." She testified that she had older siblings that lived in another state. She stated that her older sister did not like her dad because he did "bad things to her too" and that "my mom knew about that."

Stephen Chiovolini, Amy's therapist, testified that he had been treating Amy for approximately six months. Chiovolini testified that Amy was sexually inappropriate around the children, including admittedly having sex in the same room where the children were

4

sleeping. He stated that Amy was making progress in her treatment but that she needed approximately another year or more before it would be safe for her to have supervised visitation with the children. He stated that there had been a setback in Amy's treatment the day before the hearing when he learned for the first time that Amy had known that her son, C.S., had been masturbating Mike. Chiovolini also stated that there were unconfirmed allegations that Amy had taught C.S. this behavior. Chiovolini stated that Amy had difficulty being honest about what had happened with the children and had a history of not disclosing information to him. He said he was pleased with her progress but declined to make a recommendation on whether the children should be returned to her. He said that "she has a lot more work to do as far as her sexual behaviors." On cross-examination by Amy's attorney, Chiovolini stated that Amy had been sexually abused as a child and had needed inpatient mental-health treatment as a result.

Aaron Triplett, a forensic interviewer at the Cooper Anthony Mercy Advocacy Center in Hot Springs, testified that he forensically interviewed G.G. twice. He stated that G.G. disclosed sexual abuse by her father, was consistent throughout the two interviews, demonstrated sexual knowledge beyond what would normally be expected for a child her age, and appeared to be credible. He stated that G.G. never disclosed sexual abuse by her mother, and Triplett said that he did not get the impression that G.G. was afraid of her mother.

Adam Maisen, a mental-health therapist who had been treating G.G. and C.S., stated that G.G. was working on personal-space issues and knowing right from wrong in her relationships with other people. He stated that her issues stemmed from her sexual abuse. He also testified that she was academically delayed. He testified that G.G. was doing well in her

5

current foster situation and was adjusting well to school. Maisen testified that G.G. had no desire to ever see her father due to his abuse and that she had a lot of anger against her mother for failing to protect her. He stated that G.G. did not wish to return to her mother's care because she did not feel safe there. Maisen also testified that, as a result, G.G. had become "ultra-attached to her foster family."

Maisen testified that C.S. had discipline problems at school. Specifically, C.S. had been disciplined for touching other students inappropriately. In his foster home, C.S. struggled with control issues and hoarding items such as batteries and food. Maisen explained that, because C.S. was coached by his parents to steal and lie from a young age, he now lies frequently and steals items from his foster home. Maisen also testified that C.S. was significantly delayed academically, which caused him to feel helpless and to give up on trying to succeed in school.

Maisen testified that it would not be in either child's best interest to be returned to either Mike or Amy. Maisen acknowledged that he had never worked with Mike or Amy but stated that any progress Amy had made in obtaining stable housing and employment would not change his recommendation that the children not be returned to her.

DHS family services worker Keith Thomas testified that the children had never attended school and were significantly delayed in their academic development. When taken into care, neither child could read or write, and both required special-education services. While G.G. had been able to catch up to an age-appropriate grade level, C.S. was old enough to be in fifth or sixth grade but was struggling to perform in a third-grade classroom.

Thomas testified that he discovered that Mike and Amy had criminal charges and child-maltreatment investigations in multiple other states. Thomas testified that Mike did not deny

that he had previously been arrested for soliciting a prostitute and for sexually abusing his oldest daughter and that there had been a true finding of sexual abuse against him in Indiana. Thomas testified that Amy did not deny knowing about the sexual-abuse case in Indiana. He also discovered that Amy owed about $10,000 in unpaid taxes. Thomas testified that the Geatcheses had admitted that before the children were removed from their care, they had lived in motels, traveling from "Wal-Mart to Wal-Mart," stealing, and committing fraud. Thomas testified that he took the children to a Wal-Mart at one point in order to buy them some personal belongings and that the children were afraid when they entered the store. C.S. then told Thomas that it was nice "to come in and not have to steal anything."

John Anderson, a DHS family service worker, testified that DHS had provided services to Mike, Amy, and both children. Anderson recommended termination and adoption. He stated his opinion that the children were adoptable. Anderson testified that although Amy was making progress in therapy, the children needed permanency sooner than she would be able to remedy the issues that had caused removal. He believed there was little likelihood that additional services would lead to successful reunification between Amy and the children.

Amanda Neugin, representative for the Cherokee Nation of Oklahoma, testified in Amy's case as well. She stated that the Nation recommended termination and adoption due to the fact that Amy knew of sexual abuse in the home and did nothing to protect the children.

Amy testified that she was employed and had maintained stable housing for eight months. She denied having had any knowledge that Mike sexually abused the children. She denied that G.G. had ever told her that Mike touched her inappropriately. She admitted having engaged in sex acts in front of the children. She denied ever finding G.G. naked in bed with

Mike and denied having told her counselor the previous day that C.S. had masturbated Mike. She claimed that her counselor was not telling the truth or that it had been a misunderstanding. Amy acknowledged that the couple had criminal charges and DHS cases in other states. Amy acknowledged that the children "were very far behind educationally," but claimed that Mike prevented her from putting them in school. Amy stated that she had been afraid to leave Mike because, although he had never physically hurt her or the children, he manipulated her. She testified that she had filed for divorce against Mike after finding out about the sexual abuse.

Amy testified that she had been aware of the previous allegations that Mike had sexually abused his oldest daughter in Indiana. She said that she did not believe that the abuse actually happened because the charges had been dropped. She said she was not aware that there were also charges that Mike had abused an older son. She stated that she had not worried about Mike abusing G.G. because she did not believe any father could do that to his child. She acknowledged that C.S. had had a problem with defecating in his pants, which she now believed was a result of the sexual abuse by Mike. Amy denied that her children had ever been hungry. She acknowledged that they lived solely on the money they made defrauding Wal-Mart using tax-exempt cards to purchase and return merchandise. She stated that Mike had forced her to participate in the scam.

On October 26, 2015, the court entered two orders terminating Mike's and Amy's parental rights. The court entered an order terminating Amy's rights as to both children based on its finding[3] that Amy had subjected the children to aggravated circumstances, specifically

---

[3] Findings were made "beyond a reasonable doubt" pursuant to the ICWA.

sexual abuse by Mike, of which Amy had knowledge.[4] The court also found that other factors arose subsequent to the filing of the original petition for dependency-neglect to demonstrate that placement of the children with Amy would be contrary to their health, safety, or well-being, and that despite the offer of appropriate family services, Amy had manifested the incapacity or indifference to remedy the subsequent issues or factors or to rehabilitate her circumstances. Specifically, the court noted that the allegations of sexual abuse arose subsequent to the filing of the original petition. The court noted that, although Amy was making progress in her psychological treatment, she would need treatment for at least another year before being in a position to possibly regain custody of the children. The court found that it was in the children's best interest to terminate Amy's parental rights based on their likelihood of adoption and the potential harm to their health and safety if returned to Amy. The court terminated Mike's parental rights as to both children based on the same two statutory grounds. It again found that termination was in the children's best interest due to the likelihood of adoption and the risk of harm if the children were returned to Mike.

In *Knuckles v. Arkansas Department of Human Services*, we explained that we review termination-of-parental-rights cases de novo. 2015 Ark. App. 463, at 2–3, 469 S.W.3d 377, 378–79 (citing *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001)). However, we reverse a trial court's decision to terminate parental rights only when it is clearly erroneous. *Ullom v. Ark. Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 204 (2000); *Mitchell v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 715, 430 S.W.3d 851; *Brewer v. Ark. Dep't of Human*

---

[4] The court also found, relevant to this statutory ground, that Amy had admitted having sex with Mike in the same room where the children were sleeping. The court noted that there were also allegations that Amy taught C.S. sexual acts to perform on Mike.

*Servs.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a distinct and firm conviction that a mistake was made. *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999); *Hopkins v. Ark. Dep't of Human Servs.*, 79 Ark. App. 1, 83 S.W.3d 418 (2002).

On appeal, Amy challenges the sufficiency of the evidence supporting the court's finding of aggravated circumstances. She also claims that she had been successfully working her case plan and that it was error for the court to determine that there was little likelihood that additional services would result in reunification. We disagree. Amy failed to protect her children from Mike's sexual abuse. Amy's therapist testified that it would be at least a year before she would be ready for even supervised contact with her children. Moreover, the day before the hearing, new information came to light that Amy had been aware of, and possibly participated in, Mike's sexual abuse of C.S. Amy had also admitted knowingly engaging in sex acts in front of the children, which is sexual abuse pursuant to Arkansas law. Ark. Code Ann. § 9-27-303(52)(D)(iv) (Repl. 2015). We hold that there was no clear error in the court's finding that Amy subjected C.S. and G.G. to aggravated circumstances pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(*a*). Only one ground must be proved to support termination. *Hunter v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 95, at 7. Therefore, we need not address her challenges to the court's other findings regarding statutory grounds for termination.

Amy also challenges the trial court's findings as to the children's best interest. On appeal, Amy argues only that the circuit court erred in finding that there was a significant risk

of potential harm to the children were they to be returned to her care. We see no clear error in the circuit court's determination that due to the chronic sexual abuse and educational neglect the children suffered while in her care, there was a significant risk of harm in returning the children to her. As discussed above, Amy admitted knowingly engaging in sex acts in front of the children. Her therapist testified that Amy knew that C.S. was being sexually abused by Mike and may have participated in the abuse by teaching C.S. sex acts to perform on Mike. Moreover, G.G. testified that she had told her mother about the abuse and that Amy had done nothing to stop it. We affirm the trial court's finding that termination was in the children's best interest, including the court's finding that returning the children to Amy's care would likely result in serious emotional or physical damage to them. We affirm the termination of Amy's parental rights.

On appeal, Mike's counsel has filed a motion to withdraw and a no-merit brief pursuant to Arkansas Supreme Court Rule 6-9 and *Linker-Flores (I).* In dependency-neglect cases, if, after studying the record and researching the law, appellant's counsel determines that the appellant has no meritorious basis for appeal, counsel may then file a no-merit petition and move to withdraw. Ark. Sup. Ct. R. 6-9(i)(1). The petition must include an argument section listing all adverse rulings to the appellant made by the circuit court on all objections, motions, and requests made by the party at the hearing from which the appeal arose and explaining why each adverse ruling is not a meritorious ground for reversal. Ark. Sup. Ct. R. 6-9(i)(1)(A). The petition must also include an abstract and addendum containing all rulings adverse to the appellant made at the hearing from which the order on appeal arose. Ark. Sup. Ct. R. 6-9(i)(1)(B).

The clerk of this court sent Mike a copy of the brief and motion to withdraw along with a letter informing him of his right to file pro se points pursuant to Arkansas Supreme Court Rule 4-3(i)(3). Mike filed pro se points on April 20, 2016. At the same time, he filed a pro se Motion to Order Subpoenas. The two pro se documents, taken together, raise numerous challenges to the termination order, including allegations of ineffective assistance of counsel. Mike's motion for subpoenas specifically requests that we supplement the record with copies of his motions to the circuit court alleging ineffective assistance. DHS responded, stating that Mike's ineffective-assistance argument had not been raised below.[5]

The docket sheet contained in the record on appeal reveals that Mike filed numerous motions alleging ineffective assistance of counsel related to the termination hearing and that the court denied these motions. However, neither his motions nor the court's orders are contained in the record. As such, we cannot determine whether and to what extent Mike has preserved his ineffective-assistance argument. Additionally, his appellate counsel has not addressed the ineffective-assistance motions and rulings in his no-merit brief, despite his obligation to address all adverse rulings relevant to the termination order. While not raised at the termination hearing, Mike's motions alleging ineffective assistance were filed after the hearing and before the termination order was entered. They appear to directly challenge the quality of his legal representation at the termination hearing, making them pertinent to our review of the termination order.

---

[5] DHS's response addressed a few of the issues Mike raised in his pro se points and then made a blanket statement that all other issues had not been raised below. As it did not directly address his ineffective-assistance arguments, we understand DHS's position to be that Mike failed to raise ineffective assistance of counsel before the circuit court.

Therefore, we deny counsel's motion to withdraw, and we remand to supplement the record within thirty days of this opinion. We further order counsel to file a substituted brief curing all deficiencies within fifteen days from the date of filing the supplemental record.

Affirmed as to Amy Geatches; supplementation of the record and rebriefing ordered; motion to withdraw denied as to Mike Geatches.

HARRISON and GLOVER, JJ., agree.

*Leah Lanford*, Ark. Pub. Defender Comm'n, for appellant Mike Geatches

*Dusti Standridge*, for appellant Amy Geatches.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.