

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-16-888

| | |
|---|---|
| | Opinion Delivered February 15, 2017 |
| KRISTAN TROGLIN<br>APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. JV-2015-267-3] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br>APPELLEES | HONORABLE STACEY ZIMMERMAN, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

Kristan Troglin appeals the termination of her parental rights to her son, C.T.[1] Troglin challenges both the best-interest determination and the statutory grounds for termination. We affirm the termination order.

On 30 March 2015, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody of four-year-old C.T. The accompanying affidavit explained that DHS had exercised a seventy-two-hour hold on C.T. on March 25 after Troglin had been arrested for endangering the welfare of a minor. "Kristan reportedly left [C.T.] with a friend at West End Apartments and did not return to pick him up. Kristan had left [C.T.] with Nycole Fargo and a man named Mikah, but he was reportedly shuffled

---

[1]The rights of C.T.'s father, Justin Troglin, have also been terminated, but Justin is not a party to this appeal.

around to several different apartments and ended up staying with Ronnie Bridges." The affidavit noted that Justin Troglin was currently in jail. The affidavit also recited DHS's history with the Troglins:

> **March 16, 2012**: True on Kristan and Justin for Inadequate Supervision on [C.T.].
> **April 15, 2012–August 15, 2012**: Protective services case opened on the family.
> **June 2, 2014**: True on Justin for Inadequate Supervision on [C.T.].
> **July 12, 2014–September 12, 2014:** Protective services case open on the family.
> **February 16, 2015**: Pending investigation on Kristen [sic] for inadequate supervision on [C.T].
> **March 25, 2015**: Pending investigation on Kristen [sic] for inadequate supervision on [C.T.] due to these most recent allegations.

The Washington County Circuit Court granted the ex parte order for emergency custody, and on April 1, found probable cause for C.T. to remain in DHS's custody. The probable-cause order noted that Troglin was in the Intensive Care Unit but did not indicate why she was hospitalized.

In June 2015, the court adjudicated C.T. dependent-neglected due to neglect, parental unfitness, and Troglin's drug use. Troglin was allowed supervised visitation and phone visits once a week. She was also ordered to contact the family-service worker once a week, undergo a psychiatric evaluation, participate in individual counseling, not use illegal drugs or alcohol, submit to random drug screens, and obtain and maintain stable housing and employment. The adjudication order noted that Troglin had been hospitalized for seven weeks "for infections caused by drug use."

A September review order noted that Troglin had complied with some of the court orders and case plan, specifically by maintaining contact with DHS, participating in

SLIP OPINION

visitation, and submitting to drug screens. However, she had not obtained and maintained stable housing, completed individual counseling, or submitted to a psychiatric evaluation. The court noted that "[m]om is making good progress, but needs a little more time to show stability."

The court held a permanency–planning hearing in February 2016. In the subsequent order, the court found that Troglin had not complied with most of the court orders and the case plan.

> Mother has *not* obtained and maintained stable housing and employment. Mother has new housing, for approximately two months. She has new employment, for approximately two weeks. She has not completed individual counseling and has not been consistent in her attendance at counseling sessions. She has not submitted to a psychiatric evaluation. She has not submitted to random drug screens as ordered and has not passed all drug screens to which she has submitted. Mother was positive for methamphetamine, amphetamines, oxycodone, noroxycodone, and buprenorphine on February 11, 2016. This test was confirmed by the lab as being positive. She has not refrained from illegal activity. Mother was arrested in October of 2015 for Possession of Drug Paraphernalia and again in January of 2016 for Possession of Drug Paraphernalia. Mother has pending criminal charges with various upcoming court dates. She has made minimal progress toward alleviating or mitigating the causes of the juvenile's removal from the home and completing court orders and requirements of the case plan. Mother testified today that she is not in a position to have [C.T.] returned to her custody.

(Emphasis in original.) The court authorized DHS to file a petition to terminate parental rights and changed the goal of the case to adoption.

The petition for termination of parental rights, filed in March 2016, alleged the "failure to remedy" ground, the "subsequent factors" ground, and aggravated circumstances as statutory bases for termination of Troglin's parental rights. The court convened the termination hearing on 11 May 2016; however, the case was continued to allow Troglin to

obtain new counsel. The court reconvened the hearing on 9 June 2016 and heard the following testimony.

Andrea Emerson, the current family-service worker assigned to the case, recommended that Troglin's parental rights be terminated. Emerson explained that C.T. was adoptable, that he was doing well in his current foster home, and that his current foster home was a potential permanent placement. Emerson agreed that Troglin had not fully complied with the case plan, had not demonstrated stability, and had not demonstrated an ability to protect and care for C.T. Emerson also noted that Troglin had pending criminal charges and had not submitted to a drug screen since 29 March 2016. On that date, Troglin tested positive for "benzos and oxy" but told Emerson that she had a prescription. According to Emerson, Troglin had last tested positive for methamphetamine on 22 February 2016.

On cross-examination, Emerson agreed that Troglin had been diligent in attending visits since early May 2016 when Emerson had become the caseworker; that C.T. loved his mother; and that C.T. and Troglin were bonded. She also explained that Troglin had missed some visits and that the "inconsistency and unstability" caused C.T. to act out. She said that C.T. is "struggling with some sensory processing issues" and had recently been evaluated for occupational therapy.

Sierra Summers, a friend of the family, testified that she had been C.T.'s foster mom for about a year and had supervised visitation between Troglin and C.T. in her home. She said it was "very evident" that C.T. and his mother love each other but that Troglin did not engage with C.T. very much. Summers stated that C.T. would end up playing by

SLIP OPINION

himself and that she would have to repeatedly tell Troglin to play with him. Summers also said that Troglin often brought different boyfriends with her to the visitation, which was confusing for C.T. Summers explained that she eventually stopped allowing visitation in her home because she "didn't feel like it was productive for [C.T.]." She also testified that C.T. was moved from her home to another placement because she "could not handle his behavior." She said she received letters from C.T.'s school describing him as "over the top physical, over the top reactive to confrontation situations, would not respond or listen to authority or teachers, would not sit still, would not stay in timeout, started lying quite a bit, and acted out a little bit sexually inappropriately." Summers explained that she was a single mother and did not have the resources to care for C.T. and also "create a buffer" for her own son. She said that she did still see C.T. and that he and her son love each other and "call each other brothers."

C.T.'s current foster father, Zane (no last name is in the record), testified that C.T. had been in his home about a month and was acclimating very well. He said that he and his wife also have a two-year-old child with a sensory-processing disorder, so they recognized what C.T. was struggling with and had him placed in occupational therapy. Zane stated that C.T. loved therapy, had started calling him and his wife mom and dad, and that he and his wife would definitely want to adopt him if parental rights were terminated.

Troglin testified that she was a good mother and could "fully take care of [C.T.]." She said that she had a stable home and a full-time job and had "followed everything on the court order except for the findings that they already have against me." She also said that C.T. is her "best friend," that he was "everything to [her]," and that terminating her parental

rights would not be in his best interest. She testified that she had a good relationship with Justin Troglin but that they were getting divorced. She also said that she could pass a drug screen and had been clean for six months. She agreed that she wanted the court to give her more time and to implement a trial placement with her.

On cross-examination, she acknowledged that the lab confirmed a positive drug screen for methamphetamine in February, but she contended that the lab test was wrong. She also said that she had not submitted to weekly drug screens because she has to work. She explained that she had been living in her current housing since March 2016 and working at her current job for three months.

Justin Troglin testified that Kristan was a good mother and that she had never mistreated C.T. He acknowledged that he could not take C.T. but agreed that Kristan could keep him safe from harm and provide a suitable and appropriate place for him to live. Justin thought that terminating Kristan's parental rights would "completely screw that boy's head up."

Amanda McKay, a behavioral-intervention specialist for foster-care services at Ozark Guidance Center, testified that C.T. had been her client since December 2015. McKay explained that C.T. receives individual therapy once a week, family therapy once a month, and also sees a psychiatrist. She said C.T. had been diagnosed with posttraumatic stress and struggled with anxiety, impulsivity, and aggression.

At the conclusion of the hearing, the court found that Troglin's parental rights should be terminated. The written order, filed in July 2016, found that Troglin had failed to remedy the conditions that caused removal and that she had manifested an incapacity or

indifference to remedying the subsequent factors or to rehabilitating her circumstances.

Regarding failure to remedy, the court found that C.T. had been out of Troglin's custody for over twelve months and noted its own finding

> at the Permanency Planning Hearing on February 19, 2016 that the Department had made reasonable efforts toward the case plan goal of reunification but that, despite those efforts, neither parent was in compliance, neither parent had made significant and measurable progress, and neither parent had demonstrated parental fitness. The same remains true today.

Regarding subsequent factors, the court found that since the filing of the original petition in March 2015, Troglin had not been in compliance with the case plan and court orders. Again, the court noted its findings at the permanency-planning hearing that

> Mother had new housing, but only for two (2) months *and that* Mother had obtained new employment, but for only two (2) weeks. Mother has failed to maintain sobriety, testing positive for methamphetamine, amphetamines, oxycodone, noroxycodone, and buprenorphine on February 11, 2016. This test was confirmed by the lab. Mother was arrested in October of 2015 for Possession of Drug Paraphernalia and again in January of 2016 for Possession of Drug Paraphernalia. Mother's criminal charges are pending.

(Emphasis in original.) Finally, in discussing C.T.'s best interest, the court found the following:

> [T]he Court finds that [C.T.] is the one paying the price in this case. [C.T.]'s recent aggression is due to the choices of [his] parents. DHS has been involved with Mother since 2012. Mother is in partial compliance today, but the Court finds that *even if* Mother had done everything ordered of her, Mother cannot meet [C.T.]'s needs. [C.T.] is a unique child; he has post-traumatic stress disorder (PTSD) and has special needs. Mother cannot meet his needs. Mother has not submitted to weekly random drug screens as ordered. Mother has not completed counseling—despite having been ordered to do so in May of 2015. Mother did not keep all of her counseling appointments. Mother tested positive for methamphetamine in February of 2016. Mother has not remedied the conditions which caused removal. Mother is not a fit parent and continues to make poor choices. Mother's visits with [C.T.] have not been nurturing.

SLIP OPINION

(Emphasis in original.) The court found that C.T. is adoptable and that returning C.T. to Troglin would place him "back into a situation which is not safe for him." Troglin has timely appealed the circuit court's order.

A circuit court's order that terminates parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2015); *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is proof that will produce in the fact-finder a firm conviction on the allegation sought to be established. *Dinkins*, *supra*. On appeal, we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to assess the witnesses' credibility. *Id.*

The goal of Arkansas Code Annotated section 9-27-341 is to provide permanency in a minor child's life in circumstances in which returning the child to the family home is contrary to the minor's health, safety, or welfare, and the evidence demonstrates that a return to the home cannot be accomplished in a reasonable period of time as viewed from the minor child's perspective. *Id.*; Ark. Code Ann. § 9-27-341(a)(3). Parental rights may be terminated if clear and convincing evidence shows (1) that it is in the child's best interest and (2) that statutory grounds have been proved. *Hune v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 543. One statutory ground is sufficient to support the termination of parental rights. *Geatches v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 344, 498 S.W.3d 344.

Troglin first argues that neither of the statutory grounds for termination that were found against her were supported by sufficient evidence. She then challenges the circuit court's best-interest determination.

## I. *Failure to Remedy*

The "out of custody for twelve months" and "failure to remedy" ground requires the circuit court to find that

> a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*). Troglin asserts that there was insufficient evidence that she failed to remedy the cause of C.T.'s removal. She argues that the circuit court cited to her lack of progress at the permanency-planning hearing, but lack of compliance was not the reason for C.T.'s removal. She contends that he was removed after she had left him with friends and that she was arrested for endangering the welfare of a minor; however, there was no evidence that she was actually charged with endangerment, and there was evidence that she was unable to return to C.T. because she was hospitalized. Troglin argues that the circuit court's findings on this ground actually fall within the "subsequent factors" ground.

We affirm on this point. What Troglin's argument does not explain is that she was hospitalized, and therefore unable to care for C.T., due to "infections caused by drug use," and one of the bases for adjudication was Troglin's drug use. And yet, Troglin tested positive for drugs in February 2016 when C.T. had been in DHS custody for almost a year.

And though she claimed to be drug free on the date of the termination hearing, the court was not required to believe her or to conduct a drug test to verify her claim. The circuit court did not err in finding that Troglin had not remedied the conditions that led to C.T.'s removal. Because one statutory ground is sufficient to support the termination of parental rights, *Geatches*, *supra*, we need not address Troglin's argument regarding subsequent factors.

## II. *Best Interest*

Troglin asserts that there was insufficient evidence to support the conclusion that C.T. faced a substantial risk of harm if returned to her. She argues that Emerson was relatively new to the case and "had no working knowledge" of the basic facts, so her "unsupported" opinion that C.T. would not be safe if returned to Troglin does not constitute evidence on which the circuit court could rely. She also disputes that the record supports the court's finding that C.T. has special needs or that Troglin is incapable of meeting those needs. Finally, she asserts that the circuit court erred in "not considering the evidence of the loving and deep rooted bond between Kristan and C.T." She concludes that it was "unreasonable for the trial court to fail to even consider allowing a little extra time for Kristan to accomplish everything that was needed for a successful reunification."

We first note that "substantial risk of harm" is not the correct standard. In conducting a best-interest analysis, the court must consider the potential harm in returning the child to the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(ii). This potential-harm inquiry is but one of the many factors that a court may consider, and the focus is on the potential harm to the health and safety of a child that might result from continued contact with the parent. *Tadlock v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 841, 372 S.W.3d

403. The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Id.* Furthermore, the potential-harm analysis should be conducted in broad terms. *Id.*

In this case, Troglin's relatively late compliance with some parts of the case plan, her noncompliance in other areas (drug screens), and evidence of her continued drug use all support the court's finding on this point. We therefore affirm the circuit court's finding that C.T. faced potential harm if returned to Troglin's care.

Affirmed.

HIXSON and BROWN, JJ., agree.

*Tina Bowers Lee*, Arkansas Public Defender Commission, for appellant.

*Mary Goff*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.